**IDAHO CONSERVATION LEAGUE, Idaho Wildlife Federation, Idaho Environmental Council, Idaho Sportsmen's Coalition, Inland Empire Public Lands Council, and the Sierra Club, Plaintiffs–Appellants,**

v.

**John MUMMA, F. Dale Robertson, and the United States Forest Service, Defendants–Appellees,**

**Intermountain Forest Industry Association, Defendant–Intervenor–Appellee.**

No. 90–35796.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 12, 1991.

Decided Feb. 26, 1992.

As Amended May 6, 1992.

Victor M. Sher, and Todd D. True, Sierra Club Legal Defense Fund, Seattle, Washington, for plaintiffs-appellants.

Alan Charles Raul, Gen. Counsel, Raymond Fullerton, Asst. Gen. Counsel, Michael L. Gippert, Deputy Asst. Gen. Counsel, Vincent L. DeWitte and Jeffrey A. Knishkowy, Office of the Gen. Counsel, U.S. Dept. of Agriculture, Washington, D.C., for defendants-appellees.

Steven P. Quarles and Thomas R. Lundquist, Crowell & Moring, Washington, D.C., for defendant-intervenor-appellee.

Before D.W. NELSON, NOONAN and T.G. NELSON, Circuit Judges.

D.W. NELSON, Circuit Judge:

At stake in this litigation is an area comprising 858,000 roadless acres situated in 47 different roadless zones within the Idaho Panhandle Forest ("IPNF"). Plaintiffs, a coalition of six conservationist/environmental organizations,[1] challenged the Forest Service's decision to recommend against wilderness designation 43 of these 47 roadless areas, claiming that it violated the National Forest Management Act, 16 U.S.C. § 1600 *et seq.* ("NFMA"), and the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA").

On August 8, 1990, the district court granted summary judgment for the defendants, the Forest Service and defendant-intervenor Intermountain Forest Industry Association ("IFIA"). The court held, first, that ICL lacked standing to sue. In the alternative, it ruled that plaintiffs were barred from litigating claims they had failed to raise at the administrative level and that, on the merits, the Forest Service had adequately complied with all relevant

---

**1.** These are: the Idaho Conservation League, the Idaho Wildlife Federation, the Idaho Environmental Council, the Idaho Sportsmen's Coalition, the Inland Empire Public Lands Council, and the Sierra Club. For purposes of this lawsuit, they are designated, collectively, as the "ICL."

regulations. The ICL appealed. We find that the district court erred in finding that ICL did not have standing, but affirm the district court's decision on the merits.

## BACKGROUND

### 1. Statutes and Regulations

At the heart of this controversy is the Forest Service's plan for managing the more than 2 million acres of the IPNF. Pursuant to a number of interconnected congressional directives, the Secretary of Agriculture is entrusted with the responsibility of administering vast expanses of national forests. *See State of California v. Block*, 690 F.2d 753, 757 (9th Cir.1982). The central statute in this case is the NFMA, which directs the Secretary to "develop, maintain, and, as appropriate, revise land and resource management plans ["LRMP"] for units of the National Forest System." 16 U.S.C. § 1604(a). An LRMP must provide the overall management direction and general guidelines for a period of up to 15 years. 16 U.S.C. § 1604(b).

But the Secretary does not have to manage land alone. He must also juggle the myriad concurrent statutes or regulations that the NFMA, by direct or indirect reference, incorporates. First, in developing an LRMP, the Secretary is required to "provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple-Use Sustained Yield Act ["MUSY"] ... and, in particular, include coordination of outdoor recreation, range timber, watershed, wildlife and fish, and wilderness ..." 16 U.S.C. § 1604(e).[2]

This reference to "wilderness" triggers the applicability of the Wilderness Act, aimed at protecting areas "where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." 16 U.S.C. § 1131(c). Although the Act vests Congress with exclusive authority to designate wilderness areas, the Secretary is directed to recommend "primitive" areas to Congress for such designation.[3] The Forest Service is required to protect the character of areas it recommends for wilderness designation until further redesignation, as it may only approve land use that is consistent with the land management plan. 16 U.S.C. § 1133(b).

Moreover, the land management plans must be prepared in compliance with NEPA. 16 U.S.C. § 1604(g)(1). Accordingly, the regulations promulgated by the Secretary provide that an LRMP must be accompanied by appropriate draft and final Environmental Impact Statements ("EIS"). 36 C.F.R. § 219.10(b).[4] NEPA also requires a "detailed statement ... on ... alternatives to the proposed action ..." 42 U.S.C. 4332(2)(C).

Finally, pursuant to 16 U.S.C. § 1604(g), the promulgated regulations describe in detail the process for developing a land management plan. Schematically, this involves a two-stage approach. During the initial stage, a team under the direction of the Forest Supervisor develops a proposed LRMP together with a draft and final EIS. 36 C.F.R. § 219.10(a),(b). In compliance with NEPA, the plan must result from the formulation and evaluation of a broad range of alternative management scenarios with the aim of "identifying the alternative that comes nearest to maximizing net public benefits." 36 C.F.R. § 219.12(f).[5] After

---

**2.** Pursuant to MUSY, 16 U.S.C. § 528 *et seq.*, national forests must be administered with an eye to "outdoor recreation, range, timber, watershed, and wildlife and fish purposes." More generally, multiple use is defined in part as "the management of all the various renewable surface resources of the national forest so that they are utilized in the combination that will best meet the needs of the American people." 16 U.S.C. § 531(a).

**3.** Once granted wilderness designation by Congress, an area is "administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future

use and enjoyment as wilderness, and so as to provide for the protection of these areas ..." 16 U.S.C. § 1131(a).

**4.** NEPA directs federal agencies proposing "major Federal actions significantly affecting the quality of the human environment" to prepare an EIS. 42 U.S.C. § 4332(2)(C).

**5.** 36 C.F.R. § 219.12(f) provides in pertinent part:

(1) Alternatives shall be distributed between the minimum resource potential and the maximum resource potential to reflect to

review, the Regional Forester either approves or disapproves the proposal. 36 C.F.R. § 219.10(c). If approved, the plan and final EIS are supplemented by the Regional Forester's record of decision ("ROD"). *Id.*

Direct implementation of the LRMP occurs at a second stage, when individual site-specific projects are proposed and assessed. The Forest Supervisor must ensure that all projects are consistent with the plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.11(e). Further NEPA analysis is conducted to evaluate the effects of the specific project and contemplate a range of alternative actions, including a "no action" alternative. 40 C.F.R. §§ 1502.14(d), 1508.-9(b). *See generally Citizens for Environmental Quality v. United States*, 731 F.Supp. 970, 977 (D.C.Colo.1989).

The draft forest plan and EIS relating to the IPNF, which included 12 alternative proposals, were released on April 19, 1985. After a period of public comment, the final plan and associated EIS were issued in August 1987. The plan included a 13th alternative. The Regional Forester signed the Record of Decision on September 17, 1987, selecting Alternative 13 from the EIS as the official Forest Plan. On October 20, 1987, plaintiffs challenged through administrative channels countless aspects of the Regional Forester's ROD regarding the

IPNF and its accompanying EIS.[6] For the sake of expediency, the Chief of the Forest Service ("Chief") severed the roadless area issue from the remainder of ICL's appeal, leaving the surviving questions for another day.[7] Accordingly, that question alone is now before this court.

### 2. The Roadless Area Issue

Under the adopted plan, parts of four of the IPNF's 47 inventoried roadless areas are to be recommended for wilderness designation, amounting roughly to 18% of the current roadless acreage.[8] In its administrative appeal, the ICL alleged that, in its attempt to expand timber harvesting, the Forest Service's plan sacrificed vast expanses of roadless land without considering all available alternatives. In particular, it claimed that timber production goals could be met while recommending *all* of the roadless area for wilderness.

Moreover, given the cost of harvesting timber in currently roadless areas, the ICL claimed that timber sales would yield no profit. The failure to address the possibility of increasing timber harvests through intensive management of already developed areas and to disclose the real value of timber from roadless areas were challenged as violations both of the NFMA and of NEPA.

---

the extent practicable the full range of major commodity and environmental resource uses and values that could be produced from the forest. . . .

(2) Alternatives shall be formulated to facilitate analysis of opportunity costs and of resource use and environmental trade-offs among alternatives and between benchmarks and alternatives.

(3) Alternatives shall be formulated to facilitate evaluation of the effects on present net value, benefits, and costs of achieving various outputs and values that are not assigned monetary values, but that are provided at specified levels.

(4) Alternatives shall provide different ways to address and respond to the major public policy issues, management concerns, and resource opportunities identified during the planning process.

6. This is not the sole such attack on Forest Service plans developed pursuant to the NFMA. Indeed, over sixty plans have been the subject of

formal administrative appeals. *See Citizens for Environmental Quality*, 731 F.Supp. at 976.

7. The ICL's overall contention was that "[w]henever a broad 'programatic' plan . . . results in site-specific impacts, then the EIS must address such impacts in a site-specific manner," which, it alleged, the IPNF EIS failed to do. Excerpt of Record ("E.R.") 1, Exh. B. Its detailed criticism was contained in a 326–page Statement of Reasons. *Id.*

8. The four areas are Salmo–Priest, Scotchman Peaks, Selkirk Creat, and Mallard–Larkins. In addition, the final plan recommends 16% of the roadless area for continued roadless status, 7% for management which does not necessitate road construction and 59% for development. E.R. 1, Exh. A. These recommendations were made pursuant to 36 C.F.R. § 219.17(a), which provides that "roadless areas within the National Forest System shall be evaluated and considered for recommendation as potential wilderness areas during the forest planning process."

On August 15, 1988, the Chief upheld the Regional Forester's decision, finding in particular that the EIS's treatment of the roadless areas was adequate for NEPA purposes. In reaching this decision, he relied heavily on the fact that the decisions at stake were not irreversible or irrevocable, and therefore did not necessitate the type of site-specific analysis that, it appeared, would be necessary to satisfy the ICL.

Thereafter, the appellants filed a complaint in the district court for the District of Montana. Their claims were threefold: First, the Service violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and NFMA by failing to provide a rational explanation for its decision to recommend for wilderness designation only 4 of the 47 roadless areas; second, the absence of a rational explanation for its decision to develop portions of the remaining 43 areas also violated these statutes; third, the Service violated NEPA by failing to examine the plan's full environmental effects and to explore all reasonable alternatives in the EIS. Accordingly, plaintiffs sought an order directing the Service to conduct a comprehensive environmental impact analysis and vacating the ROD insofar as the roadless areas were concerned, and an injunction against all bidding or awarding of development contracts on the 43 disputed areas until such requirements be met.

The district court granted summary judgment to the defendants on three alternative grounds. The ICL, it ruled, could not bring this suit to begin with because it lacked standing. In addition, because the ICL had not raised its first two claims in the administrative proceeding, it was barred from raising them before the district court.[9] Finally, the district court ruled that the EIS was adequate insofar as all relevant environmental and economic as-

pects were duly considered, roadless areas individually described, and alternatives properly assessed. The dispute between the ICL and the Service, it opined, merely was a disagreement between experts that "will not serve to invalidate an EIS" because "an agency is able to rely on the opinions of its own experts in making its decisions." E.R. 100 at 15. The ICL timely appealed.

## DISCUSSION

### 1. Standing

#### a. Standard of Review

The district court's grant of summary judgment on the issue of standing is reviewed *de novo. PETA v. Department of Health & Human Services*, 917 F.2d 15, 17 (9th Cir.1990).

#### b. *Standing Analysis*

Through its tangled and fluctuating formulations, the doctrine of standing might well have become "a word game played by secret rules," *Flast v. Cohen*, 392 U.S. 83, 129, 88 S.Ct. 1942, 1967, 20 L.Ed.2d 947 (1968) (Harlan, J., dissenting); at its core, however, it embodies a basic jurisdictional idea born of Article III's "case or controversy" requirement. In various ways, the question it seeks to ask simply is "whether ... the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).

In order to establish standing, "[a] plaintiff must allege [1] *personal injury* [2] *fairly traceable* to the defendant's allegedly unlawful conduct and [3] likely to be *redressed* by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).[10]

**9.** The ICL does not challenge this ruling on appeal.

**10.** One commentator has persuasively argued that, in cases of statutory rights, courts should eschew any abstract "injury in fact" inquiry and merely "look[ ] to the underlying 'relevant' statute to determine whether the would-be plaintiff has standing." Fletcher, *The Structure of Stand-*

*ing*, 98 *Yale L.J.* 221, 264–65 (1988). Insofar as the statute defines the duty, it characterizes the injury and, if not explicitly, implicitly describes those who are entitled to enforce it. In *Primate Protection League v. Tulane Educ. Fund,* — U.S. ——, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991), the Supreme Court, by approvingly citing to the

■ In the instant case, appellants allege two types of injuries to support their standing in federal court. First, they seek relief from the loss of affirmative statutory protection flowing from the Forest Service's recommendations against wilderness designation. Second, they contend that appellees' action threatens harm in the shape of future development on currently roadless areas. In reality, both injuries are but two sides of a single coin: It is the alleged procedural failure in the EIS (the actual, present harm) that "create[s] a risk that environmental impact will be overlooked" (in the future).[11] *Kunzman,* 817 F.2d at 491. The question is whether the ICL is entitled to adjudication of this particular claim.

#### (i) *Personal Injury*

■ The personal injury requirement will be met only if the alleged harm is "distinct and palpable ... and not abstract or conjectural or hypothetical." *Allen,* 468 U.S. at 751, 104 S.Ct. at 3324 (internal quotations and citations omitted). There is a sense in which the answer in this case is straightforward. Where, as here, Congress is the source of the purportedly violated legal obligation, we look to the statute to define the injury. *See Primate Protection League,* 111 S.Ct. at 1704 ("standing is gauged by the specific common-law, statutory or constitutional claims that a party presents"); Fletcher, *supra,* at 250–65; *supra* note 9. The statutes sought to be enforced in this case, of course, are NEPA and the NFMA (via Section 10 of the APA). [12]

■ From this perspective, the right claimed by appellants is, among others, the right to have agencies consider all reasonable alternatives before making a decision affecting the environment, as required by NEPA. The harm alleged by the ICL is thus one that Congress—by virtue of imposing NEPA's procedural requirements—has acknowledged. Indeed, as this court found in *Hodel,* because "NEPA is essentially a procedural statute designed to ensure that environmental issues are given proper consideration in the decisionmaking process," injury alleged to have occurred as a result of violating this procedural right confers standing. 806 F.2d at 1380, 1382; *see also United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Friends of the Earth v. United States Navy,* 841 F.2d

article, suggested that it found merit to this view. *Id.* 110 S.Ct. at 1704.

In cases dealing with NEPA, the D.C. Circuit also has suggested a streamlined approach, reasoning that because "NEPA creates a right to information in the environmental effects of government actions ... any infringement of that right constitutes a constitutionally cognizable injury, without further inquiry into causation or redressability." *Competitive Enterprise Institute v. NHTSA,* 901 F.2d 107, 123 (D.C.Cir. 1990). The cursory manner in which other courts have treated standing issues in NEPA cases indicates that this often is in fact what occurs. *See, e.g., Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 491 (9th Cir.1987); *Trustees for Alaska v. Hodel,* 806 F.2d 1378, 1380 (9th Cir.1986).

In the absence of a more definite resolution of these questions, and despite the appeal of such alternative approaches, we adhere to the more traditional *Allen* analysis.

11. Although the IFIA argues that the ICL did not allege a procedural injury, even a cursory reading of appellants' complaint suggests otherwise. The ICL explicitly "challenged John Mumma's failure to analyze or disclose fully the environmental effects of the Forest Plan Implementa-

tion Schedule," a failure which amounted to a violation of the NFMA, NEPA and the APA. Complaint for Declaratory and Injunctive Relief, E.R. 1, at 2. As the Eighth Circuit held in *Defenders of Wildlife, Friends of Animals v. Hodel,* 851 F.2d 1035, 1041 (8th Cir.1988), this amounts to pleading a procedural harm.

12. Section 10(a) of the APA provides that "a person ... adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. In cases arising under the APA, the standing requirement has been read to mean that plaintiffs must show " 'the challenged action ha[s] caused them injury in fact' and that the injury is 'to an interest arguably within the zone of interests to be protected or regulated by the statutes that the agencies were claimed to have violated.' " *Wilderness Society v. Griles,* 824 F.2d 4, 11 (D.C.Cir.1987) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972)); *see also Lujan v. National Wildlife Federation,* — U.S. —, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990); *PETA,* 917 F.2d at 17.

927, 931 (9th Cir.1988) (noting that "[t]his court has long recognized that failure to follow procedures designed to ensure that the environmental consequences of a project are adequately evaluated is a sufficient injury in fact to support standing"); *Kunzman,* 817 F.2d at 491; Fletcher, *supra,* at 258–62.

Having determined that plaintiffs' "aggrievement" is "within the meaning of the relevant statute," 5 U.S.C. § 702, we must address two objections raised by appellees. First, they argue that the effect of the challenged action is too remote to sustain standing; second, they contend that the facts alleged by appellants do not show that their *personal* interests are affected.

Agreeing with appellees, the district court denied standing because the purported injury is several degrees removed from the challenged action. Pointing to the fact that the Plan does not propose any specific development, the court thus found the ICL's alleged injury to be too speculative for standing purposes.[13] Appellees substantiate this point by arguing that the threat of injury—if threat there is at all—is not one but numerous steps away. The actual, site-specific decisions regarding development are made at a later stage, and each decision must be accompanied by an EIS calibrated to the project's degree of specificity. Moreover, the agency is required to consider a "no-action" alternative under which the proposed action would be halted. *See City of Tenakee Springs v. Block,* 778 F.2d 1402, 1406 (9th Cir.1985).[14] Whether or not projects will be developed also depends on extrinsic factors, such as the price of timber. Finally, they argue that the ultimate decision regarding wilder-

ness designation lies in Congress', not the agency's, hands.[15]

■ We are not persuaded by appellees' arguments. To begin with, that the injury be "threatened" rather than "actual" does not defeat the claim. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Kunzman,* 817 F.2d at 491 (citing *Heckler v. Mathews,* 465 U.S. 728, 738, 104 S.Ct. 1387, 1394, 79 L.Ed.2d 646 (1984)). Nor need the risk of injury be certain, as opposed to contingent. *See Kunzman,* 817 F.2d at 491. In particular, that the potential injury would be the result of a chain of events need not doom the standing claim. *See Griles,* 824 F.2d at 12, 18.

■ Consequently, that Congress and other third parties would have to act before actual development could take place is not dispositive of the ICL's claim. In numerous cases, courts have ruled that a possible chain of third-party responses to agency action was sufficient to confer standing. Indeed, that was the case in *SCRAP, Kunzman* (plaintiffs have standing to challenge EIS issued by the Secretary of Agriculture *authorizing* the State of Oregon to use chemical insecticides), and *Trustees for Alaska* (plaintiffs have standing to bring NEPA claim against the Secretary of the Interior for failure to submit an EIS, even though only *Congress* could actually impair their environmental rights).

An added wrinkle in this case is the fact that the agency itself will have to take further action, in compliance with NEPA,

---

**13.** The court reasoned:

The Plan does not deal with any specific development of those areas which were designated as nonwilderness. It does not even propose any future development; it merely allows for the possibility of development in the future.... The threatened injury in this case is too remote.

E.R. 100 at 5–6.

**14.** This approach was adopted by the Service in response to this court's decision in *Block,* 690 F.2d 753. *Block* invalidated the prior scheme under which, once an area had not been recom-

mended for wilderness designation, the agency could not consider its wilderness characteristics before making site-specific decisions. The new rule tempers the effect of a non-wilderness recommendation, allowing projects to be disapproved for the sake of preserving an area's wilderness features.

**15.** In upholding the Regional Forester's decision, the Chief stressed that "[t]he occurrence of individual projects will depend upon a variety of factors, including: Congressional appropriations, multiple-use objectives, and market conditions." E.R. 1, Exh. B at 11.

before authorizing site-specific development. Thus, not only is the risk contingent, it also is subject to future safeguards from the same agency and statutory source. The Seventh Circuit faced an analogous situation in *Rockford League of Women Voters v. United States, Etc.*, 679 F.2d 1218 (7th Cir.1982). In *Rockford*, plaintiffs challenged the Nuclear Regulatory Commission's decision not to revoke a permit to construct a nuclear plant. The standing issue was raised because the plant could not operate in the absence of further action by the Commission—namely, the granting of an operating license, which could not be done unless the plant met the requirements imposed by agency regulations. *Id.* at 1219, 1221. The court nonetheless ruled in the plaintiffs' favor in light of the risk that the Commission, armed with the construction permit and faced with the completed plant, would be "stampeded into granting a license regulation." *Id.* at 1222.

■ The same is true here. Notwithstanding the fact that their concrete effect might be seriously mitigated at the site-specific, project level, the initial plan and wilderness recommendation represent important decisions. This becomes particularly clear if we bear in mind the statutory

source that defines appellants' right and imposes appellees' duty. The standing examination, in other words, must focus on the likelihood that the defendant's action will injure the plaintiff *in the sense contemplated by Congress*.

Viewed in this light, and whether or not it is irrevocable, the Service's decision is harmful for standing purposes. The ICL's complaint is that the faulty EIS has made possible development that wilderness designation would have prevented. Pursuant to NEPA and the NFMA, these are injuries that we must deem *immediate*, not speculative. Indeed, short of assuming that Congress imposed useless procedural safeguards, and that wilderness designation is a superfluous step, we must conclude that the management plan plays some, if not a critical, part in subsequent decisions.[16]

More importantly perhaps, if the agency action only could be challenged at the site-specific development stage, the underlying programmatic authorization would forever escape review. To the extent that the plan pre-determines the future, it represents a concrete injury that plaintiffs must, at some point, have standing to challenge.[17] That point is now, or it is never.

Appellees' second objection relates to the plaintiffs' obligation to show a *personal*

---

**16.** In particular, opting for a "no-action" course is by definition not tantamount to granting the roadless areas the affirmative protection contemplated by wilderness designation.

**17.** Appellants have submitted additional documentation to this court that further substantiates their views and their fears. In justifying his decision to implement certain projects in the Horizon Forest Resource Area, the District Ranger stated:

> During the development of the Idaho National Forest Plan the decision was made to manage specific areas as roadless and undeveloped. The former Skitwish Ridge Roadless Area #01135, which is approximately 6300 acres in size, was not one of these areas, and I am not revisiting the land allocation decisions made in the Forest Plan.

Horizon Forest Resource Area—Record of Decision, at 9.

In rejecting detailed consideration of a wilderness recommendation alternative for the Hellroaring Roadless Area, the Final Environmental Impact Statement accompanying the West Moyie ROD echoed this view:

> The administrative procedures for evaluating possible Wilderness recommendations are separate from the procedures employed to consider specific land management activities. As defined by 36 CFR 219 Part 219, possible wilderness recommendations are evaluated during the forest planning process. According to these regulations, the Forest Service determines the general, programmatic management direction for each National Forest during the initial development and subsequent revision of Forest Plans.... It is during this programmatic step in the Forest Service's decision-making process that the agency determines which lands to recommend to Congress for inclusion in the National Wilderness Preservation System.

West Moyie FEIS at 2–39. Moreover, the West Moyie ROD specifically notes that "[m]anagement decisions for the West Moyie area which were made at the Forest Planning level are excluded from" appeals of decisions made in the ROD. West Moyie ROD at 33.

While not dispositive in any sense, these developments buttress appellants' argument and their claim to standing.

stake, as opposed to a diffuse, collective interest. *See, e.g., Lujan,* 110 S.Ct. at 3187–89 (denying standing under the APA for lack of specific facts showing personal interest); *Allen,* 468 U.S. at 755, 104 S.Ct. at 3326 (standing denied unless plaintiff can show personal subjection to challenged discrimination). The requirement, stated somewhat differently, is that the ICL have "a sufficient geographical nexus to the site of the challenged project that [it] may be expected to suffer whatever environmental consequences this project may have." *City of Davis v. Coleman,* 521 F.2d 661, 671 (9th Cir.1975).

Relying on *Lujan* and *PETA,* appellees argue that the ICL has produced no evidence establishing such personal injury. Plaintiffs' general declarations alleging use of the areas that have been denied wilderness status, they claim, are insufficient since these areas cover over 100,000 acres and will not all be developed.

We find *Lujan* and *PETA* to be inapposite. In *Lujan* the plaintiffs merely alleged that they used locations "in the vicinity" of lands that would be open to mining and, moreover, most of the land in those locations already *was* open to mining. *See* 110 S.Ct. at 3187–88. In *PETA,* the court faced "averments which state[d] only that the declarant uses unspecified portions of a large metropolitan area, on some portions of which hazardous substances might be transported or disposed." 917 F.2d at 17. In contrast, a number of the ICL's members have filed declarations naming the *specific* areas they are accustomed to visit and enjoy.[18]

Of course, while the ICL has pointed to individuals whose enjoyment of *particular* roadless areas is threatened, it cannot specify which locations will be developed because that decision has yet to be made. However, this simply replicates the problem evoked earlier: Because no development has yet to be authorized, plaintiffs cannot provide any more detail than they have. To the extent that the *threat* of development in one specific area is sufficient—and *Kunzman* among others found that it was—a similar threat to a number of specified areas also must suffice, so long as the plaintiffs have alleged that the injury would be felt by individual members.

#### (ii) *Fairly Traceable and Likely to be Redressed*

Standing under the APA or the Constitution will be found only if the plaintiff can show that his injury has been caused by the conduct of which he complains and that it is redressable by the remedy he seeks. *Allen,* 468 U.S. at 751, 104 S.Ct. at 3324. We can deal with the two components together, for they are both " 'alike in focusing on the question of causation.' " *City of Los Angeles v. NHTSA,* 912 F.2d 478, 483 (D.C.Cir.1990) (quoting *Haitian Refugee Center v. Gracey,* 809 F.2d 794, 801 (D.C.Cir.1987) (opinion of Bork, J.)). Appellees argue that the alleged injury is not fairly traceable or redressable because the ultimate decision will be the result of a confluence of factors, including the actions of Congress, private parties, and larger economic trends.

However, these arguments are better addressed to the first prong of the standing test. Indeed, in cases involving chains of events, it is common to confuse, as appellees do in this instance, the issue of the *likelihood* of harm with its *cause.* As the *Griles* court explained,

[T]he likelihood of the injury, whether or not that likelihood depends upon a single event or a chain of events, is properly a concern of the personal injury inquiry.... [T]he causation question ... concern[s] only whether plaintiffs' injury ... is dependent upon [the agency's] policy, or is instead the result of independent

---

**18.** For example, Dennis Baird, a member of the Idaho Environmental Council declared that he routinely hikes to the Grandmother Mountain, Pinchot Butte, Mosquito–Fly and Meadow Creek/Upper North Fork roadless areas. The Service's decisions, he explains, "threaten [his] recreational use of these areas." E.R. 48. *See also* E.R. 49 (declaration by Paul Vogel); E.R. 51 (declaration by Jerry Pavia); E.R. 52 (declaration by Clint Watkins); E.R. 53 (declaration by Harry Batey).

incentives governing [the third parties'] decisionmaking process.

824 F.2d at 18.

Cases in which standing has been denied on causation grounds illustrate this point. Thus, in *Allen*, the Supreme Court found that the alleged injury (diminished ability to attend racially integrated schools) was not fairly traceable to the challenged action (the IRS's grant of tax exemptions to racially discriminatory institutions) because the schools could carry on their policies even if the exemptions were to cease. 468 U.S. at 758, 104 S.Ct. at 3328. Likewise, in *Simon*, the Court denied standing because the purported injury "result[ed] from the *independent* action of some third party not before the court." 426 U.S. at 42, 96 S.Ct. at 1926 (emphasis provided).

In contrast to *Simon* and *Allen*, in the instant case the injury—failure to make wilderness recommendations, purportedly as a result of statutory violations—would not have occurred *but for* the Secretary's decision. In this respect, the fact that development might never take place or that redrafting an EIS might not in any way change the Secretary's recommendations to Congress is irrelevant. The asserted injury is that environmental consequences might be overlooked and reasonable alternatives ignored as a result of deficiencies in the final EIS and ROD. The ultimate outcome following proper procedures is not in question. *See International Ladies' Garment Workers' Union v. Donovan,*

722 F.2d 795, 811–12 (D.C.Cir.1983) ("the suggestion that effective enforcement of [the Act] will not have [effect] directly contravenes the congressional judgment underlying the Act"); *Munoz–Mendoza v. Pierce,* 711 F.2d 421, 428 (1st Cir.1983).

Indeed, even if we were to accept appellees' characterization of the injury as potential physical development on the Idaho Panhandle, their "third party" argument would be to no avail. The third parties could not undertake their future actions *but for* the challenged decision. The non-wilderness recommendation is thus the primary factor making possible subsequent development.[19]

Appellants have satisfied the three prongs of the *Allen* test. The district court's denial of standing is therefore reversed.

### 2. Ripeness

Citing *Lujan*, appellees further contend that this case is not ripe for adjudication. The basis for this claim is essentially the same as for their standing argument: No concrete action affecting appellants' rights has yet been taken; only when the more site-specific actions occur will the case have sufficiently ripened.[20] *See Lujan*, 110 S.Ct. at 3190.

In *Lujan*, plaintiffs alleged that in its "land withdrawal review program," the BLM had violated both NEPA and the Federal Land Policy and Management Act of 1976 (FLPMA) by failing to, *inter alia,*

---

**19.** In an analogous case regarding wilderness recommendations, the court in *Sierra Club v. Watt,* 608 F.Supp. 305 (E.D.Cal.1985), had this to say:

> Defendants' argument will not lie. The Secretary's order, as in other cases of land management involving the removal of public property from wilderness consideration, has a palpable and thus cognizable effect.... [T]hese areas will not be considered for the affirmative protection of wilderness classification....
>
> Defendants' suggestion that the real cause of plaintiffs' injury is potential development by persons other than [the Bureau of Land Management] also will not lie. The development activity of third parties on these lands is not 'the independent action of some third party not before the court' ... but instead is a direct result of the Secretary's action. Central

to the issue are traditional notions that for there to be a break in the chain of causation, the intervening event must not be only a cause, but the only cause of injury; i.e., if the complained of action is a 'but for' cause ... it suffices for standing purposes....

> [An injunction] would redress plaintiffs' alleged injury by returning certain lands to wilderness status and by compelling the government to examine the consequences of its action as to other lands.

*Id.* at 315–16.

**20.** As the Supreme Court has noted, "The standing question ... bears close affinity to questions of ripeness—whether the harm asserted has matured sufficiently to warrant judicial intervention." *Warth v. Seldin,* 422 U.S. 490, 499 n. 10, 95 S.Ct. 2197, 2205 n. 10, 45 L.Ed.2d 343 (1975).

consider multiple uses for the disputed lands and include an appropriate EIS. *Id.* 110 S.Ct. at 3183–84. Because the regulation at issue was a general program of land review, too vast in the Court's eyes to be considered an "agency action," it was found not to be ripe for challenge. *Id.* at 3190.[21]

Inapposite for purposes of the standing discussion, *Lujan* also is inapposite here. The fundamental difference is that the ICL is not challenging an entire program, or "rules of general applicability," *id.* at 3190, but rather their implementation in a particular instance, the IPNF roadless areas. The decision complained of—the asserted violation of NEPA and the NFMA—was "clear and final." *See Kunzman,* 817 F.2d at 492; *Trustees for Alaska,* 806 F.2d at 1381; *see also Sierra Club,* 608 F.Supp. at 317 (holding that "the Secretary's action is final as to [the land's] consideration for wilderness status").

We emphasize once again that, to the extent the EIS and ROD have an impact on Congress' final decision, waiting until the Department acts on a specific project would not be an adequate remedy. Moreover, a future challenge to a particular, site-specific action would lose much force once the overall plan has been approved—especially if the challenge were premised on the view that the overall plan grew out of erroneous assumptions. *See supra* note 17.

Therefore, we find that the agency's action was ripe for review.

*3. Adequacy of the EIS*

a. Standard of Review

"This circuit employs a 'rule of reason' that asks whether an EIS contains a ' "reasonably thorough discussion of the significant aspects of the probable environmental consequences." ' " *Kunzman,* 817 F.2d at 492 (quoting *Block,* 690 F.2d at 761 (quoting *Trout Unlimited v. Morton,* 509 F.2d

1276, 1283 (9th Cir.1974))). A reviewing judge must make "a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation.... Once satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end." *Block,* 690 F.2d at 761.

b. Substantive Challenges

Reduced to its core, the ICL's suit consists of two objections to the EIS and ROD. First, appellants argue that the impact statement failed to reveal or consider the alternative of logging the preferred amount of timber from already developed lands and designating for wilderness all of what are now roadless areas. Second, they fault the Service for its failure to reveal the value of the timber it proposes to harvest on the roadless areas.

(i) *Alternative Plan*

■ The alternative section is "the heart of the environmental impact statement," 40 C.F.R. § 1502.14; hence, "[t]he existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Citizens for a Better Henderson v. Hodel,* 768 F.2d 1051, 1057 (9th Cir.1985). While the practicalities of the requirement are difficult to define, NEPA provides that all agencies of the Federal Government shall, to the fullest extent possible, "[s]tudy, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). Whether a particular EIS has met this demand can best be determined by its purpose, which is to "ensure[ ] that federal agencies have sufficiently detailed information to decide whether to proceed with an action in light of potential environmental conse-

---

**21.** The Supreme Court stated:
[A] regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the APA until ... its factual components [have been] fleshed out [ ] by

some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm them. *Id.* 110 S.Ct. at 3190.

quences, and [to] provide[ ] the public with information on the environmental impact of a proposed action and encourage[ ] public participation in the development of that information." *Kunzman*, 817 F.2d at 492; *see also Citizens for a Better Henderson*, 768 F.2d at 1056.

As a result, an agency must look at every reasonable alternative, with the range dictated by the "nature and scope of the proposed action," *Block*, 690 F.2d at 761, and "sufficient to permit a reasoned choice." *Methow Valley Citizens Council v. Regional Forester*, 833 F.2d 810, 815 (9th Cir.1987), *rev'd on other grounds sub nom. Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

Plaintiffs' contention is that the range of alternatives was inadequate because of the Service's failure to recognize that expanding timber harvesting into currently roadless areas is necessary only if one wants to meet higher timber demands *in the future*, at the expiration of the 10 to 15–year period with which the Plan is concerned. Because the harvesting levels that would compel the immediate allocation of roadless areas to timbering will not be reached under the current plan, the ICL argues that its preferred alternative (wilderness recommendation for all roadless areas) was reasonable and should have been included.[22]

In response, appellees argue, first, that the ICL's preferred alternative *was* considered. Indeed, among the alternatives suggested, one contemplated that all 47 roadless areas be recommended for wilderness designation (Alternative 3), another that 75% of the roadless areas be so recommended (Alternative 10).[23] The inclusion of alternatives similar to the one put forward by plaintiffs was held sufficient by the court in *Headwaters, Inc. v. BLM, Medford District*, 914 F.2d 1174 (9th Cir.1990), and *Northern Plains Resource Council v. Lujan*, 874 F.2d 661, 666 (9th Cir.1989).

Second, appellees remark, appellants themselves supported one of the proposed alternatives (Alternative 7), in which portions of only five roadless areas would be recommended for wilderness designation. Third, appellees contend that the ICL's alternative was not raised at the administrative level. As the Supreme Court has noted, intervenors must "alert the agency to [their] positions and contentions." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553, 98 S.Ct. 1197, 1216, 55 L.Ed.2d 460 (1978).[24] More generally, they point to the undisputably long and detailed EIS accompanying the final decision as evidence of the "hard look" to

**22.** According to the ICL, the source of the Secretary's error in not including plaintiffs' alternative is to be found in the computer program used by the Forest Service to assess the forest's capacity to produce resources and in the assignment of unrealistically high values to timber in the future. E.R. 34, Exh. 12 at x. The program, called FORPLAN, could not consider the possibility of harvesting the preferred level of 280 million board feet (mmbf) in the first year without logging currently roadless areas because it was too forward looking, contemplating sale schedules over a period of a century, rather than the decade envisaged by the Plan.

Much of this explanation is taken from the disputed "O'Toole" affidavit that appellees argue is beyond the administrative record and therefore inadmissible. It is true that "judicial review of agency action is limited to a review of the administrative record." *Friends of the Earth v. Hintz*, 800 F.2d 822, 828 (9th Cir.1986). However, "[a] court may consider evidence outside the administrative record as necessary to explain agency action.... The purpose of the court's enquiry should be to ascertain whether the agency considered all relevant factors or

fully explicated its course of conduct or grounds of decision." *Id.* at 829. The issues presented by this case are sufficiently complex with the affidavit, let alone without it, to justify using it as needed. *See, e.g., Citizens For Environmental Quality*, 731 F.Supp. at 982–83 (admitting affidavits by O'Toole and McQuilan explaining the FORPLAN model in a similar case).

**23.** The other alternatives suggested that 8%, 15%, 16%, 17%, 30%, or 44% of the roadless areas be recommended for wilderness designation.

**24.** More precisely, the Court cautioned that

administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.'

*Id.* at 554, 98 S.Ct. at 1217.

which their choice was subjected and contend that, to the extent the ICL's proposal differed from their alternatives, it was rejected because it would lead to serious disruption on the already developed lands, exacting an excessive environmental cost.

The district court agreed. While not making a specific finding as to the reasonableness of the alternative, it relied on its conclusion that the alternative was not presented for consideration before the ROD was issued, or at the administrative appeal, and that in any event it was just "a variation of an alternative already considered." Finally, it described the controversy between the agency and the ICL as a mere dispute between experts, and ruled that "an agency is able to rely on the opinion of its own experts."

 We conclude that the ICL's proposed alternative was adequately presented. In one affidavit, it was suggested that the Service use a new Forplan program under which the Service might find that "a considerable number of additional roadless acres can be added to the current preferred alternative without reducing timber harvests." E.R. 23, Exh. A (Reaction to draft plan and draft EIS). The claim was reiterated in comments to the final EIS and Plan. *See id.*, Exh. B (noting that "several hundred thousand acres of roadless lands and other money-losing forest lands could be removed from the timber base without reducing the proposed first decade timber sale level"). And, in their "Statement of Reasons" to the Chief of the Forest Service, appellants stated that the Plan "fails to consider a 'value' based alternative: intensively managing good growing sites close to mills." E.R. 34, Exh. 12, at ix.

Nor do we give great weight to appellants' endorsement of Alternative 7 in the administrative stages. As mentioned above, the ICL also made repeated claims that higher timber yields could be achieved by intensifying harvests on already roaded areas. Thus, in a letter to the Service, the ICL wrote:

> We request that the Forest defer development of a final Plan and [final] EIS pending a detailed supplement to the [draft] EIS.... At this point [we tend] to favor the concepts and goals of Alternatives 9 or 7 rather than your proposed Alternative 11. Assuming a significant number of changes will result from your reevaluation, *we are withholding total support for any alternative described in the current DEIS.*

E.R. 43, Exh 2 (emphasis added). In short, the agency should not be permitted to take refuge behind the plaintiffs' simultaneous support for two scenarios, all the more so since NEPA was not designed to be an adversarial, but rather a cooperative and informational endeavor.

We come, therefore, to the heart of this dispute—the meaning of word "alternative." It is beyond dispute that the EIS included proposals containing percentages of roadless areas for wilderness designation similar to the percentages advocated by plaintiffs. Nevertheless, those alternatives were rejected because one variable—timber production—was found to be inadequate. In ICL's proposal, by contrast, that variable was set at a level which matched the appellees' goal. For instance, while Alternative 3 recommended all roadless areas for wilderness designation, it was discarded because it yielded a lower timber harvest in the first decade.[25] The ICL's proposal, on the other hand, combined Alternative 3's wilderness acreage with Alternative 13's first decade timber yield.

---

**25.** The ROD was set out as follows: (1) it established the average and allowable sale quantity (ASQ) in the first decade at 280 mmbf with increases to be followed; (2) it factored in variables such as public responses to issues, environmental quality, or economic efficiency; (3) the alternatives yielding superior wilderness results (Alternatives 3, 7, 9 and 10) all produced higher levels of non-market resources and lower timber harvest levels (under Alternative 3, 162 mmbf; Alternative 7, 223 mmbf; Alternative 9, 196 mmbf; and Alternative 10, 218 mmbf); (4) it chose Alternative 13 because it "makes available proper timber volume and other important amenities;" (5) it compared Alternatives 13 and 3, concluding in essence that while number 3 was the environmentally superior one—in terms of wilderness, water quality, fishing and soil disruption objectives—it must be rejected because of its diminished timber yield.

Appellees argue that they rejected the ICL's alternative because it did not meet the Plan's standards. Gerald House, one of defendant's experts, explains in his affidavit that Alternative 3 coupled with a timber yield of 280 mmbf in the first decade would have caused a substantial reduction in economic efficiency and other environmental interests and would have jeopardized the stability of future timber supply. Appellees claim that they programmed their internal FORPLAN computer system to generate only alternatives which met certain criteria. As a result, they claim that when wilderness acreage was held at Alternative 3's high level, the computer generated a low first decade timber yield— 162 mmbf—because that was the only way to avoid the high environmental damage to developed areas it was programmed to reject. ICL counters that a programming error in the FS's system prevented the generation of an alternative with both higher wilderness acreage and a first decade timber yield of 280 mmbf.

In the absence of evidence to the contrary, we accept the FS's explanation that its computer program was designed to reject alternatives which would involve unacceptable environmental damage to already developed areas. As a reviewing court examining the record for NEPA compliance, we are not in a position to prefer ICL's view of the FS's software over the FS's explanation. ICL may well disagree with the substantive decisions informing the program design. Nevertheless, it has given us no reason to doubt the FS's position.

What we do take from this debate is that the FS *did* consider ICL's alternative, albeit not in the form of a full-blown alternative detailed in the EIS. In planning the EIS, we think that the FS was entitled to identify *some* parameters and criteria—related to Plan standards—for generating alternatives to which it would devote serious consideration. Without such criteria, an agency could generate countless alternatives. Worse yet, in an attempt to avoid NEPA litigation, an agency might engage in the empty exercise of generating and "considering" countless alternatives, even alternatives known to be unacceptable at the outset. Based on the record before us, we believe that the FS's explanation for why the ICL proposal was rejected reflects choices made in the process of planning and generating a useful EIS.

We stress that discarding an option by invoking *ex post facto* justifications or referring to criteria derived from the selected alternative does *not* constitute compliance with NEPA's mandate. Nor do we mean to imply that the criteria an agency adopts are necessarily beyond challenge—the development of such criteria·must of course be consistent with the procedural requirements of NEPA. Here, however, ICL does not quarrel, at least not explicitly, with the FS's criteria with respect to acceptable levels of environmental damage in already developed areas.

■ Accordingly, we hold that appellees have considered and rejected an alternative based on intensified timber production from already developed areas. That alternative was rejected because it would have caused unacceptable damage to already developed areas. ICL may disagree with the FS's substantive evaluation of what ICL refers to as the "win-win" alternative, but that is beside the point. The FS has met its procedural obligations under NEPA.

#### (ii) *Value of Timber*

Appellants also fault the EIS for failing to reveal the value of the timber to be harvested from the roadless areas. They claim that in so doing, the agency has skewed the analysis, for a proper study would have revealed that such harvesting was economically inefficient and fortified the argument in favor of intensified development in already roaded areas.

■ However appealing, their position finds support neither in precedent nor in statutory language. Of course, without a more detailed accounting of the economic value of timber harvesting on roadless areas, the cogency of the Service's Plan cannot fully be assessed since one needs to balance environmental and non-environmental benefits. But NEPA does not re-

quire a particularized assessment of non-environmental impact. *See* 42 U.S.C. § 4332; *Public Util. Com'n of State of California v. FERC*, 900 F.2d 269, 282 (D.C.Cir.1990). This is particularly true at such an early stage, where the EIS is merely "programmatic." *See Block*, 690 F.2d at 761 (noting "preference to defer detailed analysis until a concrete development proposal crystallizes the dimensions of a project's probable environmental consequences") (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 402, 96 S.Ct. 2718, 2726, 49 L.Ed.2d 576 (1976)).

### CONCLUSION

We conclude that the district court erred in holding that plaintiffs lacked standing to bring this suit. However, we find that the Forest Service did consider the alternative of meeting current timber needs over the life of the Plan from already developed areas. Finally, we agree with the district court that the Forest Service was not required to undertake a site-specific economic analysis of timber value. Therefore, we AFFIRM the district court decision on its merits.

NOONAN, Circuit Judge, concurring:

I concur in the judgment, but do not reach the merits. The plaintiffs made no showing that their interests were "actually affected" by the agency action of which they complained. *Lujan v. National Wildlife Federation*, — U.S. —, 110 S.Ct. 3177, 3187, 111 L.Ed.2d 695 (1990).