In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-2084

COREY H. *et al.*, on behalf of a class of
similarly situated persons,

*Plaintiffs-Appellees,*

*v.*

THE BOARD OF EDUCATION OF
THE CITY OF CHICAGO,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 92 C 3409—**Robert W. Gettleman**, *Judge.*

———————

ARGUED FEBRUARY 19, 2008—DECIDED JULY 17, 2008

———————

Before MANION, KANNE, and TINDER, *Circuit Judges*.

KANNE, *Circuit Judge*. In what is the latest chapter of the long-running *Corey H.* litigation, the Board of Education of the City of Chicago ("the Chicago Board") appeals an order that the district court entered in its role of overseeing the ten-year-old civil consent decree that lies at the heart of this case. The Board presents no justiciable argument, however, so we dismiss its appeal.

## I. History

In recounting the factual and procedural history of this protracted matter, we will simplify greatly. Sixteen years ago, a group of disabled students who attended schools administered by Chicago Public Schools (CPS), and to whom we will simply refer as "the Plaintiffs," filed a putative class-action lawsuit against the Illinois State Board of Education ("the Illinois State Board"), as well as against other governmental entities and officials. Among the numerous claims that the Plaintiffs raised was the allegation that the Illinois State Board was responsible for CPS's district-wide practice of assigning disabled students to schools and classrooms solely according to their disability classifications. According to the Plaintiffs, such assignment practices violated the mandate of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, that children should be educated in the least restrictive environment ("LRE") according to their individual needs. The Illinois State Board eschewed settlement with the Plaintiffs and proceeded to a bench trial, but lost; in granting judgment for the Plaintiffs, the district court determined that the Illinois State Board violated IDEA by, among other things, failing to ensure that CPS complied with IDEA's LRE mandate. The court thus ordered the Illinois State Board to submit a plan detailing how it would bring CPS into compliance with the law.

In response to the district court's judgment, in June 1999 the Illinois State Board entered into a consent decree with the Plaintiffs in which it outlined the steps that it would take to correct CPS's noncompliance with IDEA and to monitor CPS's future compliance. As relevant to the Chicago Board's appeal, the Plaintiffs and Illinois State Board agreed to the following:

(1) The district court would retain jurisdiction over the decree until January 16, 2006, though any party could petition the court for an extension of the court's jurisdiction in "extraordinary circumstances."

(2) The district court would appoint a Monitor who would oversee "all aspects of the implementation of [the decree]," and who would be charged with "tak[ing] any reasonable steps necessary to ensure compliance with [the decree]." And as part of the Monitor's broad powers to oversee the decree, the Monitor would have the authority "[to] collect any information relevant to carrying out [its] duties."

(3) The Plaintiffs, the Chicago Board, and the Illinois State Board would establish a number of "district-wide targets" that CPS would be required to meet to show that it was making progress in complying with IDEA. For instance, together the parties would formulate "[t]he minimum and maximum parameters of the percentages of students with disabilities who should be in attendance in any school." If the parties were unable to agree upon those targets by July 16, 1999, then the duty of establishing the targets would shift to the Monitor.

(4) If any CPS school was unable to meet an established target, then the Chicago Board could request an exemption—or what the parties have labeled a "waiver"—for the school. The "basis and process" for obtaining a waiver would be "established jointly" by the Plaintiffs, the Chicago Board, and the Illinois State Board, and implemented as part of the Illinois State Board's plan for overseeing CPS's compliance with IDEA.

Although the Illinois State Board and the Plaintiffs entered into the consent decree in good faith, negotiations apparently became complicated once the Chicago Board was brought into the fold. After the district court accepted the decree, the Plaintiffs, the Chicago Board, and the Illinois State Board were unable to agree upon a number of items related to the decree's implementation, such as the numerous targets for CPS's compliance, and the substantive and procedural criteria that would govern how the Chicago Board could request waivers from those targets. The Monitor therefore took it upon itself to formulate the targets, leading it to determine, among other things, that beginning on June 1, 2005, the maximum percentage of students with disabilities in any school in the CPS system could be no greater than 20% of the school's total student population. The Monitor also stated that the Illinois State Board could grant waivers to schools from the 20% cap, and that any rationale "for any waiver [would have to] be provided to the Monitor and the [P]laintiffs"; however, like the parties, the Monitor did not establish any criteria that would govern the Chicago Board's waiver requests.

The Chicago Board objected to the district court, arguing that the 20% enrollment cap was erroneously based on the Monitor's inconsistent use of nationwide statistics and definitions of terms used to determine IDEA compliance. But in an order issued on February 17, 2000, the district court rejected the Chicago Board's arguments and concluded that the Monitor did not abuse its discretion by formulating the 20% cap.

For five years, the Chicago Board sought no waivers from the Monitor's targets. Then, on June 1, 2005—the deadline by which all CPS schools were required to com-

ply with the 20% enrollment cap—the Chicago Board sent a letter to the Monitor and the Illinois State Board, seeking waivers for 96 schools from the 20% cap. However, the Chicago Board provided no information supporting its waiver requests for about half of the schools listed, and for the other half listed, the Chicago Board provided only conclusory, one sentence "explanations." In response, the Monitor informed the Chicago Board that the scant information it provided would not allow the Illinois State Board "to make an informed decision" regarding the waiver requests, nor would it allow "the Monitor's Office or the Plaintiff's counsel to provide any significant input into the decision-making process." And citing its authority under the consent decree "[to] collect any information relevant to carrying out [its] duties," the Monitor asked the Chicago Board to "provide further support for its 'explanation[s]'" for its waiver requests, including: (1) a historical summary of the numbers and percentages of students with disabilities in the schools listed since the 1998-1999 school year; (2) a description of all efforts made to reduce the number of students with disabilities in the schools listed; and (3) the Chicago Board's rationale as to why the 20% cap needed to be breached in the schools listed. However, the Chicago Board did not provide any further information to the Monitor.

A month after it asked the Chicago Board to supplement its waiver requests, the Monitor filed with the district court a status report regarding CPS's compliance with the consent decree. The Monitor noted that although the Chicago Board had made a "considerable effort towards fulfilling the commitments it undertook in the [decree]," the board had failed to satisfy "[m]any of

[its] significant commitments." To explain this determination, the Monitor pointed to a number of the Chicago Board's deficiencies, including the fact that 96 schools in the CPS system had been unable to comply with the 20% enrollment cap.

The Monitor acknowledged that the Chicago Board sought waivers for those schools, but also explained that, because the Chicago Board had yet to provide any "supporting documentation" that would justify granting the waivers, the Monitor was unable to determine whether the Illinois State Board should grant the requests. The Monitor therefore concluded that the Chicago Board had failed to ensure that its schools complied with the 20% enrollment cap. And because the "institutional change envisioned" by the consent decree had not yet been accomplished due to the Chicago Board's and CPS's numerous failures, the Monitor determined that "much work remain[ed]," and recommended extending the deadline by which the district court was to cease exercising jurisdiction over the decree—January 16, 2006—to "the end of the 2009-2010 school year."

The Plaintiffs moved the district court to adopt the Monitor's findings in its status report, including the Monitor's recommendation to extend the court's jurisdiction over the consent decree to the 2009-2010 school year. In an order issued on March 7, 2007 (the "March 7 Order"), the district court adopted the Monitor's decision. Over the Chicago Board's objections, the district court both extended its jurisdiction over the decree until September 1, 2010, and confirmed that the maximum percentage of disabled students allowed per school remained at 20%. The court also noted that the 20% cap "may be waived upon application," and that the Monitor retained the

authority under the decree "to require supplemental information" when reviewing the Chicago Board's waiver requests; the court, however, was silent as to the procedural and substantive criteria that would govern the requests. The court then continued the matter, and ordered the parties to report for a status hearing on April 9, 2007.

## II. ANALYSIS

The Chicago Board appeals from the district court's March 7 Order, asserting that the court "abused its discretion" by reaffirming the 20% enrollment cap. But jurisdictional questions abound, the least of which being whether the federal statutes outlining our jurisdiction, 28 U.S.C. §§ 1291 and 1292, allow us to hear the Chicago Board's appeal.

The Chicago Board wisely concedes that § 1291 is not the source of our jurisdiction; that provision grants us jurisdiction over a district court's final decision, *see* 28 U.S.C. § 1291, which the district court's March 7 Order is not, *see Jones-El v. Berge*, 374 F.3d 541, 543 (7th Cir. 2004); *Bogard v. Wright*, 159 F.3d 1060, 1062 (7th Cir. 1998).

Instead, the Chicago Board asserts that we have jurisdiction under § 1292(a)(1), which grants us jurisdiction over an appeal from an interlocutory order in which a district court grants an injunction. As the Chicago Board points out, an order entered as a part of the district court's role in administering a consent decree is properly characterized as an appealable "injunction" when it "substantially and obviously alters the parties' pre-existing legal relationship." *Jones-El*, 374 F.3d at 543-44; *see also Heartwood, Inc. v. U.S. Forest Serv., Inc.*, 316 F.3d 694, 698

(7th Cir. 2003); *Gautreaux v. Chi. Hous. Auth.*, 178 F.3d 951, 958 (7th Cir. 1999). And, the Chicago Board continues, the district court's March 7 Order "substantially altered the legal relationship" between the Plaintiffs, the Chicago Board, and the Illinois State Board in three ways: (1) by "imposing" the 20% enrollment cap, a target that the decree does not specify that CPS was required to meet; (2) by placing the authority for determining the basis and process for obtaining a waiver solely in the hands of the Monitor, although the decree stated that the basis and process for obtaining a waiver would be determined jointly by the Plaintiffs, the Chicago Board, and the Illinois State Board; and (3) by granting the Plaintiff's motion to extend the district court's jurisdiction over the decree until September 1, 2010.

The Chicago Board's first two points find no support in the record. Contrary to the Chicago Board's assertion, the district court did not "impose" the 20% enrollment cap in its March 7 Order; the cap had been in place since February 2000, when the district court rejected the Chicago Board's objection to the Monitor's formulation of the cap. And even if the court did "impose" the cap in the March 7 Order, any such "imposition" certainly would not have modified the decree. The decree required the parties to agree upon targets—such as the cap—to ensure that CPS complied with IDEA's LRE mandate, and authorized the Monitor to develop the targets when the parties were unable to agree upon them. Thus, we do not understand how the district court could have altered the legal relationship between the parties by approving a target that was expressly contemplated when the Plaintiffs and the Illinois State Board entered into the decree. *See Bogard*, 159 F.3d at 1064 (stating that

district court's extension of consent decree's term was not modification because parties agreed court could extend decree on its own: "[h]ad the defendants wanted to limit the judge's power, they could have insisted on appropriate language").

Moreover, the district court did not grant the Monitor the sole authority to determine how the Chicago Board can obtain a waiver. Nothing in the court's March 7 Order suggests that the Monitor has the authority to formulate the waiver criteria; the court merely reaffirmed the Monitor's authority to request information that would help it determine whether a waiver request should be granted. And nothing in the Monitor's letter to the Chicago Board or its status report suggested that it was dictating how the Chicago Board must seek a waiver. Indeed, no one—not the Plaintiffs, the Chicago Board, the Illinois State Board, the Monitor, or the district court—has provided any explanation, either in the record or on appeal, as to how the Chicago Board can seek a waiver, or what the Chicago Board must establish to obtain a waiver.

However, the Chicago Board's third point—that the district court modified the consent decree by granting the Plaintiff's motion to extend its jurisdiction over the decree until September 1, 2010—has merit. But for the district court's grant of the Plaintiffs' motion, the court would not have had jurisdiction over the decree past January 16, 2006, meaning that this matter, along with the Chicago Board's obligations under the decree, would have ended over a year-and-a-half ago instead of continuing today. The extension of the court's jurisdiction thus was a substantial alteration of the parties' legal relationship *vis-à-vis* the decree. *See id.*

("Suppose the termination provision had read simply, 'the monitor's activities shall be terminated on June 30, 1997.' Then if the plaintiffs had wanted him extended they would have had to move under [the decree] for a modification."); *cf. Sierra Club v. Marsh*, 907 F.2d 210, 213-15 (1st Cir. 1990) (refusing interlocutory appellate review over district court order that did not continue injunction "in any jurisdictionally significant respect"). And as such, we have jurisdiction under § 1292(a)(1) to hear the Chicago Board's appeal from the March 7 Order.

That is not to say that the Chicago Board's challenge to the 20% enrollment cap is justiciable—it is not. We will assess the Chicago Board's challenge to the 20% cap only if it is ripe, meaning that the cap will lead to " 'concrete action' " being taken against the board. *See Sierra Club v. Marita*, 46 F.3d 606, 614 (7th Cir. 1995) (quoting *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1518 (9th Cir. 1992)); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (holding agency program for applying statute not ripe for review). And we will not address the Chicago Board's arguments if they are grounded on " 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)); *see also Lehn v. Holmes*, 364 F.3d 862, 867 (7th Cir. 2004) (" 'Cases are unripe when the parties point only to hypothetical, speculative, or illusory disputes as opposed to actual, concrete conflicts.' " (quoting *Hinrichs v. Whitburn*, 975 F.2d 1329, 1333 (7th Cir. 1992))).

In arguing that the viability of the 20% enrollment cap is a justiciable issue, the Chicago Board asserts that

it faces certain injury from the cap because many schools—including the 96 schools for which the board sought waivers—will not be able to comply with the 20% requirement. Thus, the Chicago Board continues, the schools would be forced either to violate the 20% cap in derogation of the consent decree, or to take steps to comply with the cap (such as, the board asserts, transferring disabled students from the schools "wholesale") that will ultimately violate state and federal law.

But the Chicago Board completely ignores that it will suffer this injury only if the schools are not granted waivers from the cap—an event that has yet to occur. Indeed, the Chicago Board has not completed even one waiver request; the Monitor was unable to opine on the Chicago Board's earlier 96 waiver requests because the board had not provided the Monitor with the additional information the Monitor had sought. Moreover, there is nothing in the record that suggests that the Chicago Board will be unable to obtain waivers.

Even more, we cannot venture to express an opinion as to whether the Chicago Board could successfully seek waivers because, as we have repeated throughout this Opinion, there is *nothing* in the record explaining the waiver process or criteria. Thus, the most we can say at this point is that the Chicago Board's asserted injury is squarely grounded on events that " 'may not occur at all,' " *Texas*, 523 U.S. at 300 (quoting *Thomas*, 473 U.S. at 581), namely, the denial of its waiver requests.

Simply put, it is too early for us to entertain any challenge to the 20% enrollment cap because the Chicago Board may still seek and obtain waivers for the schools that cannot comply with the cap. We have no doubt that the Chicago Board will seek waivers from the cap, as well

as from other targets the Monitor formulated; thus, for the benefit of all involved in this drawn-out litigation, it would be prudent for the parties to make the development of the waiver procedure and criteria their highest priority. But until the parties develop those procedures and criteria, and until those procedures and criteria lead to a " 'concrete action' " taken against the Chicago Board, *Marita*, 46 F.3d at 614 (quoting *Idaho Conservation League*, 956 F.2d at 1518), we decline to entangle ourselves in an "abstract disagreement" about the appropriateness of the 20% cap, or any other target that stems from the Illinois State Board's consent decree, *see Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967); *Hinrichs*, 975 F.2d at 1333.

### III. CONCLUSION

We DISMISS the Chicago Board's appeal.