OREGON NATURAL RESOURCES COUNCIL; Forest Conservation Council; Concerned Friends of the Winema; National Wildlife Federation; Portland Audubon Society; The Wilderness Society; and Natural Resources Defense Council, Plaintiffs,

v.

John LOWE, Regional Forester, U.S. Forest Service, Bob Castaneda, Forest Supervisor Winema National Forest; United States Forest Service; and United States Department of Agriculture, Defendants,

Thomas Lumber Company, an Oregon corporation; Modoc Lumber Company; an Oregon corporation; Columbia Plywood Inc., an Oregon corporation; Northwest Forestry Association, an Oregon non-profit corporation; and Northwest Forest Resource Council, an Oregon non-profit corporation, and Kenneth W. Dunn, Defendant–Intervenors.

Civ. No. 92–1121–AS.

United States District Court,
D. Oregon.

Sept. 24, 1993.

David B. Edelson, Nathaniel S.W. Lawrence, Natural Resources Defense Council, San Francisco, CA, Gary K. Kahn, Reeves, Kahn & Eder, Portland, OR, for plaintiffs.

Jack C. Wong, U.S. Atty., D. Oregon Thomas C. Lee, Asst. U.S. Atty., Larry A. Brown, Sp. Asst. U.S. Atty., Val J. McLam Black, Sp. Asst. U.S. Atty., Portland, OR, for defendants.

Michael E. Haglund, Scott W. Horngren, Haglund & Kirtley, Portland, OR, for defendants-intervenors.

## OPINION

ASHMANSKAS, United States Magistrate Judge:

Plaintiffs, defendants and defendant-intervenors have each moved for summary judgment in plaintiffs' lawsuit challenging the Forest Service's management of old growth forests on the Winema National Forest, located on the eastside of the Cascade Mountains in south-central Oregon. For the following reasons, defendants' summary judgment motion is granted and this case is dismissed.

## BACKGROUND

Plaintiffs challenge the Forest Service's actions under two statutes: the National Forest Management Act of 1976 (NFMA) and the National Environmental Policy Act (NEPA). NFMA imposes a substantive duty on the Forest Service to provide sufficient habitat to maintain viable, well-distributed populations of wildlife species throughout their existing ranges. NFMA directs the Secretary of Agriculture to develop, maintain, and, as appropriate, revise land and resource management plans (Forest Plans) for each unit of the National Forest system. 16 U.S.C. § 1604(a). In developing Forest Plans, the Secretary of Agriculture is to "use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences," 16 U.S.C. § 1604(b), and must provide for public participation in development and review. 16 U.S.C. § 1604(d).

The regulations describe the process for developing, maintaining, amending and revising Forest Plans. They also set forth the requirements for the interdisciplinary approach and for public participation. 36 C.F.R. §§ 219.5 and 219.6. The sections of the regulation from 36 C.F.R. §§ 219.14 through 219.26 address the various individual resources and how they are to be integrated into forest planning.

Once approved, the Forest Plan requires compliance with standards and guidelines in implementation of individual site-specific projects. Individual site-specific projects must be evaluated for compliance with the requirements of NEPA, the Endangered Species Act and other applicable laws and regulations.

NEPA imposes a procedural duty on the Forest Service to obtain information and undertake analysis necessary for the agency to consider the environmental consequences of its actions.

Plaintiffs move for summary judgment on each of their five claims as follows: (1) the Winema land and resource management plan (Forest Plan or LRMP) failed to provide sufficient habitat to maintain viable populations of species that inhabit old growth forests, contrary to NFMA and the agency's regulations, 36 C.F.R. § 219.19; (2) the final environmental impact statement (FEIS) ac-

companing the LRMP failed to include essential information and analysis regarding old growth forests and wildlife, contrary to NEPA, 42 U.S.C. § 4321, the regulations of the Council on Environmental Quality (CEQ), 40 C.F.R. § Part 1500, and Forest Service regulations, 36 C.F.R. Part 219; (3) the Forest Service violated NEPA by failing to prepare a supplemental EIS in order to consider new Forest Service data which showed that the Winema contains far less old growth habitat than had been assumed in the LRMP; (4) the Forest Service's failure to prepare an EIS on Amendment 3 to the LRMP violated NEPA, because Amendment 3 decided which of the Winema's old growth forests will be protected and which will be available for logging, and will therefore have significant environmental impacts; and (5) the Forest Service's failure to designate the white-headed and black-backed woodpeckers as old growth "management indicator species" (MIS) in the LRMP violated the agency's regulations, 36 C.F.R. § 219.19(a)(1).

Plaintiffs also seek declaratory relief and a permanent injunction halting further logging of old growth until the Forest Service prepares a new LRMP and revised NEPA documents that comply with all legal requirements.

Specifically, plaintiffs allege that the LRMP fails to insure the viability of the marten, pileated woodpecker, three-toed woodpecker, black-backed woodpecker and the northern goshawk. The pileated woodpecker, marten, northern goshawk, and three-toed woodpecker are all considered by the Oregon Department of Fish and Wildlife (ODFW) as "sensitive" species whose status is "critical," indicating that "listing as threatened or endangered may be appropriate if immediate conservation actions are not taken." Pl.Ex. 16 at 1–2, 4–5.

The Forest Service is required by law to prepare land and resource management plans for each unit of the national forest system. 16 U.S.C. § 1604(a). The plans must be developed pursuant to NFMA and the Forest Service's planning regulations. 16 U.S.C. § 1604(g); 36 C.F.R. part 219. In addition, the plans must be accompanied by an EIS in compliance with NEPA 16 U.S.C. § 1604(g)(1); 36 C.F.R. § 219.10.

The Winema's draft LRMP and EIS were published in 1987. The plan identified the marten, pileated woodpecker, goshawk, and three-toed woodpecker as indicator species that inhabit old growth forests. In order to maintain the viability of these species, the plan contained standards and guidelines (referred to as "minimum management requirements," or MMRs) regarding the size, configuration, and type of habitat that would be managed for each species. The final LRMP and FEIS were released in 1990 and were approved in a record of decision (ROD) signed by the Regional Forester on September 19, 1990.

On March 5, 1992, the Forest Supervisor issued a Decision Notice and EA approving Amendment 3 to the LRMP. The purpose of Amendment 3 was to determine "the size, location and type of old growth stands that are to be retained," given the ROD's mandate to protect an additional 24,400 acres of old growth. EA at 1. Plaintiffs appealed the decision to approve Amendment 3, arguing that the amended plan failed to insure the viability of old growth associated wildlife and that the Forest Service had violated NEPA by failing to prepare an EIS to consider the decision's significant environmental impacts. Pl.Ex. 28. The Regional Forester denied the appeal, Pl.Ex. 29, and plaintiffs filed suit.

Counts I, II, III, and V of plaintiffs' Complaint pertain to the Forest Plan. Count IV pertains to the Forest Supervisor's decision to adopt Amendment 3 to the Forest Plan.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The materiality of a fact is determined by the substantive law on the issue. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir.1987). The authenticity of a dispute is determined by

whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553.

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Electrical,* 809 F.2d at 630.

## SCOPE OF REVIEW

In reviewing plaintiffs' claims that the Forest Service has either failed to prepare an EIS or supplement an existing EIS, this court must determine whether the agency's actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 375–76, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989); and *Greenpeace Action v. Franklin,* 982 F.2d 1342, 1349–50 (9th Cir.1992). "This standard is narrow and presumes the agency action is valid, *Ethyl Corp. v. EPA,* 541 F.2d 1, 34 (D.C.Cir.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976), but it does not shield agency action from a "thorough, probing, in-depth review." *Northern Spotted Owl v. Hodel,* 716 F.Supp. 479, 481–82 (W.D.Wash.1988) (quotation omitted).

An agency action will be considered "arbitrary and capricious" where the agency has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). This standard requires the court to "ensure that an agency has taken the requisite hard look at the environmental consequences of its proposed action, carefully reviewing the record to ascertain whether the agency decision is founded on a reasoned evaluation of the relevant factors." *Greenpeace Action,* 982 F.2d at 1350 (citations omitted).

In reviewing the record, a court must keep in mind that:

> [w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive. Once we are satisfied that an agency's exercise of discretion is truly informed, we must defer to that informed discretion.

*Id.* (citations omitted).

Plaintiffs' first two claims allege violations of NFMA or the regulations promulgated thereunder for the development and adoption of Forest Plans. I find that the standard of review for plaintiffs' NFMA claims is the same as that applying to the NEPA claims (III, IV, and V).

*Greenpeace* held:

> We see no reason to impose a different standard of review on an agency's decision not to prepare an initial EIS [from the standard applied to an agency's decision not to supplement an EIS] when the agency itself applied the same rule of reason in making that determination, and the dispute is of the same factbound character as that presented in *Marsh, . . . .* [W]e conclude that when a litigant challenges an agency determination on grounds that, in essence, allege that the agency's expert review . . . was incomplete, inconclusive, or inaccurate, the greater degree of deference

expressed by the arbitrary and capricious standard is appropriate.

*Id.,* 982 F.2d at 1350 (citations omitted).

■ In reviewing the sufficiency of a Forest Plan under NFMA and NEPA, the court must also apply the arbitrary and capricious standard of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A). This provides that an agency action may only be overturned if it is: "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■ Plaintiffs' burden is to show "that there is virtually no evidence in the record to support the agency's methodology in gathering and evaluating the data." *NRDC v. Hodel,* 624 F.Supp. 1045, 1057 (D.Nev.1985), *aff'd,* 819 F.2d 927 (9th Cir.1987). The focal point for judicial review is the agency's administrative record. *Asarco, Inc. v. EPA,* 616 F.2d 1153, 1159 (9th Cir.1980).

## DISCUSSION

### 1. *Standing*

■ In order to establish standing, "a plaintiff must allege [1] personal injury, [2] fairly traceable to the defendant's allegedly unlawful conduct, and [3] likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). In other words, the question here is "whether ... the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." *Simon v. Eastern Dy. Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).

The personal injury requirement will be met only if the alleged harm is "distinct and palpable ... and not abstract or conjectural or hypothetical." *Allen,* 468 U.S. at 751, 104 S.Ct. at 3324. The right claimed by plaintiffs, among others, is the right to have agencies consider all reasonable alternatives before making a decision affecting the environment, as required by NEPA and NFMA. The Ninth Circuit has held that because "NEPA is essentially a procedural statue

designed to ensure that environmental issues are given proper consideration in the decisionmaking process, injury alleged to have occurred as a result of violating this procedural right confers standing." *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1514 (9th Cir.1992) (citation omitted). Further, *Mumma* held that the fact that "the injury be 'threatened' rather than 'actual' does not defeat the claim ... [n]or need the risk of injury be certain, as opposed to contingent." *Mumma,* 956 F.2d at 1515 (citations omitted). I find that plaintiffs have demonstrated sufficient personal injury in the outcome through affidavits of their members, which attest to their past and prospective use and enjoyment of the Winema old-growth forest.

Standing under the APA or the Constitution will be found only if plaintiffs can show that their injury was caused by the conduct of which they complain and that it is redressable by the remedy they seek. *Allen,* 468 U.S. at 751, 104 S.Ct. at 3324. Here, the purported injury would not have occurred but for the Forest Service's actions. "The fact that development might never take place or that redrafting an EIS might not in any way change the Secretary's recommendations to Congress is irrelevant." *Mumma,* 956 F.2d at 1518.

I find that plaintiffs have standing to bring this action.

### 2. *Merits of Plaintiffs' Claims*

Plaintiffs contend that their suit "challenges the Forest Service's management of old growth forests." Plaintiffs' Summary Judgment Memorandum, p. 4. Judicial review can only be obtained where a "final agency action" is alleged. 5 U.S.C. § 702. Two such actions are identified by plaintiffs in their complaint: (1) the ROD adopting the Forest Plan; and (2) the Decision Notice adopting Amendment 3. Complaint, para. 2, 19, 23, and 25.

### A. PLAINTIFFS' NFMA CLAIMS (COUNTS I AND II)

■ Plaintiffs allege in Counts I and II violations of NFMA or the regulations promulgated thereunder for the development

and adoption of Forest Plans. Count I states that defendants have failed to provide sufficient habitat in the Forest Plan to insure continuation of viable populations of old-growth inhabiting species. Count II alleges failure of the Forest Service to designate sufficient management indicator species under NFMA regulations.

■ Plaintiffs, however, have failed to show any arbitrary and capricious violations of the regulations pertaining to planning for wildlife habitat. The courts have held that the Forest Service "has wide discretion to weigh and decide the proper uses within any area of the national forests." *Big Hole Ranchers Ass'n v. United States Forest Service,* 686 F.Supp. 256, 264 (D.Mont.1988). This discretion is granted by the Multiple–Use Sustained–Yield Act (MUSY), 16 U.S.C. §§ 528–531. The NFMA grants the agency similar discretion. The statute imposes procedural requirements, designed to assure that the agency documents how it intends to manage national forests in accordance with the principles of MUSY. *See* 16 U.S.C. § 1604(e)(1) and (2). NFMA directs the Secretary to specify guidelines for the development of land management plans that:

> provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives, and within the multiple-use objectives of a land management plan [and] provide, where appropriate, to the degree practicable, for steps to be taken to preserve the diversity of three species similar to that existing in the region controlled by the plan.

16 U.S.C. § 1604(g)(3)(B).

Final regulations guiding the content, development and form of forest plans were developed with assistance from the Committee of Scientists and promulgated on September 17, 1979 (44 Fed.Reg. 53928) and codified at 36 C.F.R. Part 219. The regulations define "diversity" as "[t]he distribution and abundance of different plant and animal communities and species within the area covered by a land and resource management plan," 36 C.F.R. § 219.3, and direct that "forest planning shall provide for diversity of plant and animal communities and tree species consistent with the overall multiple use objectives of the planning area." 36 C.F.R. § 219.26. Further, the "management prescriptions" section of the regulations provides that "management prescriptions, where appropriate and to the extent practicable, shall preserve and enhance the diversity of plant and animal communities ... so that it is at least as great as that which would be expected in a natural forest and the diversity of tree species similar to that existing in the planning area." 36 C.F.R. § 219.27(g).

The regulations require that each forest supervisor "obtain and keep current inventory data appropriate for planning and managing" the resources. 36 C.F.R. § 219.12(d). The Forest's inventories shall include "quantitative data making possible the evaluation of diversity in terms of its prior and present condition." 36 C.F.R. § 219.26.

Next, the regulations require that "fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area." 36 C.F.R. § 219.19. The regulations define a viable population as one "which has the estimated numbers and distribution of reproductive individuals to ensure its continued existence is well distributed in the planning area." *Id.* The Forest Service has interpreted the viable population provision as requiring additional attention to certain "sensitive species." Pursuant to Forest Service policy, plans must select "sensitive species," defined as those species (other than federally listed species) for which population viability is a concern because they have significant current or predicted downward trends in population numbers or density, or for which there is a significant downward trend in their current or predicted habitat which would reduce their distribution.

Third, analysis of the effects of a plan on fish and wildlife populations is facilitated by the selection and monitoring of "management indicator species" (MIS)—vertebrate or invertebrate species whose population changes are believed to indicate the effects of management activities. 36 C.F.R. § 219.19(a).

Fourth, forests are directed to undertake certain monitoring and research activities so

that they may verify, and where necessary modify, their assumptions. Specifically, a forest is directed to monitor population trends of the management indicator species and determine their relationships to habitat change. 36 C.F.R. §§ 219.19(a)(6), 219.12(k). The regulations contemplate that Forests would continue to conduct research and update inventories. 36 C.F.R. § 219.28.

Plaintiffs argue that new information now exists calling into question the management requirements for some species in the LRMP. Further, plaintiffs assert that all activities under the Plan, specifically all timber sales, must be enjoined. I find no basis for enjoining any activities under the Forest Plan. Plaintiffs' prayer to enjoin either a lengthy list of timber sales, or all timber sales, without conducting full reviews of the Forest Services' NEPA compliance for each individual timber sale, is improper.

As for plaintiffs' specific allegations regarding the marten, pileated woodpecker, three-toed and black-backed woodpeckers, and northern goshawk, I find that defendants have adequately complied with applicable requirements to provide habitat for those species in the Forest Plan. I find that defendants have amply supported their position in the record, and I rely on those findings. For brevity's sake, I will not repeat those findings here. *See* Defendants' Memo in Opposition, p. 26–39.

Based on a thorough review of the administrative record, I find that the Forest Service's compliance with NFMA was not arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

There are new research findings about several wildlife species in the Winema National Forest. Upon reviewing this research, however, I find that most of it postdates the decision made in the LRMP. The conclusions drawn from the research existing in 1990 and earlier are supported by the record. I also note that for each expert opinion offered by plaintiffs, the Forest Service provides an expert opinion which supports management decisions it made in the LRMP. As noted earlier in *Greenpeace:*

> [w]hen specialists express conflicting views, an agency must have discretion to

rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.

*Id.,* 982 F.2d at 1350.

This court does not reject the scientific methodology selected by the Forest Service. The Ninth Circuit has held:

> [Plaintiff] disagrees with the Forest Service's methodology. We are in no position to resolve this dispute because we would have to decide that the views of [plaintiff's] experts have more merit than those of the Forest Service's experts.... NEPA does not require that we decide whether an EA is based on the best scientific methodology available, nor does NEPA require us to resolve disagreements among various scientists as to methodology.

*Inland Empire Public Lands Council v. Schultz,* 992 F.2d 977, 981 (9th Cir.1993).

■ Therefore, Count I fails because the Forest Plan is not arbitrary and capricious in meeting the habitat requirements of old growth inhabiting species according to the scientific prescription that are in the record. *See* ROD, p. 14–15, and Forest Plan, p. 4–6. Count II fails because the Forest Service's rationale for selecting the species it designated as "management indicator species" is not arbitrary and capricious. That rationale is explained in the Forest Plan records, and the process of selecting indicator species is explained in Appendix J of the Draft EIS, Appendix J of the FEIS, and the responses to public comments. EIS, Appendix K, p. K–263.

### B. PLAINTIFFS' NEPA CLAIMS (COUNTS III, IV AND V)

■ I find that the Forest Service's NEPA compliance for Amendment 3 was premised on the knowledge that the Forest Plan ROD had already determined how many acres of old growth would be preserved, and how many would not be preserved. The function of Amendment 3 was to identify 24,400 acres of old growth reserved from timber harvest activity by LRMP land use allocations. The ROD contemplated the "on-the-ground" location of 24,400 acres of addi-

tional ponderosa pine and pine associated old growth according to ecologist Bill Hopkins' definition of old growth. The ROD contemplated location of the 24,400 acres of ponderosa pine old growth so that the total amount of old growth reserved from programmed timber harvest in the LRMP would equal 60,192 acres. The LRMP decision, Alternative J, assigned 59,140 acres to the old growth management area, with a no-harvest prescription. *See* ROD, p. 32. This was subsequently recomputed to 60,192 acres. Of the 60,192 acres preserved by the ORMP decision, only 24,400 acres is accounted for in any way by Amendment 3. The remaining 35,792 acres of old growth is under the same regime, Management Area 7, but is not dealt with by Amendment 3 because these old growth acres had already been identified in the LRMP.

Plaintiffs contend that the old growth inventory for the Winema National Forest was inadequate to formulate the LRMP. I disagree. The Forest Service used inventory data gathered in 1981, and updated in 1988. A complete inventory of old growth existed and was used to make land use allocation decisions, analyze environmental effects of alternatives, and inform the public and the decision-maker of the state of the existing environment. Plaintiff has presented no evidence that the data is incomplete, inaccurate, or in error.

The LRMP and accompanying FEIS use the Regional Guide definition of old growth. Forest Plan, Glossary–29; FEIS, Glossary–29. The only changes evident between the updated 1981 inventory and the Forest Plan are old growth stands lost to timber harvest, fire, and insect and disease problems between the time of inventory and the time the Forest Plan was approved. Plaintiffs have failed to present evidence to the contrary.

The administrative record does not support plaintiffs' contention that old growth inventory was not completed when the LRMP was released. The Regional forester's decision states:

My decision is to manage and preserve old-growth communities across the range of forest types to provide for indicator species viability, as well as to maintain the inherent values of these ecosystems. This includes 23,400 acres of retained old growth in the ponderosa pine working group beyond that needed to meet the management requirements for wildlife. In addition I am deciding to retain 1000 acres of old growth beyond the management requirement level in the pine associated working group.

An old-growth inventory currently in progress will be completed in 1991. This inventory will be used to locate Management Area 7 (Old-growth Ecosystems) on the ground. The inventory will also be used to verify that adequate old-growth forest exists and can be preserved in Management Area 7 as well as in wilderness, research natural areas, semi-primitive ares, unique areas, wild and scenic river areas, and minimum management areas as described in Alternative J.

ROD, p. 21.

The Forest Service knew that, under the Regional Guide definition, approximately 550,000 acres of old-growth exists on lands suitable for timber production on the Winema. FEIS, p. 3–141. The Forest Service specially preserved 60,192 acres of old-growth located on lands suitable for timber production, in old-growth management areas (Management Area 7). *See* LRMP, p. 4–84. Plaintiffs' statements regarding the lack of an adequate old-growth inventory are irreconcilable with the administrative record.

In sum, plaintiffs' Count III fails because the Forest Service's demonstration that the Forest Plan was based upon an inventory of old growth, performed according to the Regional Guide definition (EIS, p. 3–14, 3–141), is not arbitrary and capricious. Further, no inventory of the wildlife itself was shown to be necessary. The EIS properly estimates the effects of the adopted alternative (J) on old growth and dependent wildlife species. EIS, p. 4–125 to 4–144; 2–136 to 2–137 (Table 2–23); 2–99 (Table 2–14). Also, the Forest Service was not shown to have arbitrarily and capriciously failed to consider all the research that was submitted to the agency during the Forest Plan development process.

■ Count IV fails because the nature of the decision to adopt Amendment 3 is discussed in the DN, and the impacts are evaluated in the EA. *See* Administrative Record filed by defendants [AR], p. 714–719, 722–762. The Forest Service was not arbitrary and capricious in its consideration of this Amendment. Further, the Forest Service considered and addressed plaintiffs' objections in the administrative appeal process. AR, p. 831–1091.

■ Finally, as to Count V, the Forest Service itself recognized the forthcoming preparation of the new (Hopkins) inventory of old growth ponderosa pine (Forest Plan, p. 4–128). The Forest Service was not arbitrary and capricious in its decision that this new inventory does not require or result in any change in the analysis of impacts that was made in the Forest Plan, nor in its conclusion that the principles of supplementation do not apply to the Hoskins inventory. *See Oregon Natural Resources Council v. Devlin*, 776 F.Supp. 1440, 1449 (D.Or.1991) ("[t]he new circumstance must present a seriously different picture of the environmental impact(s) ..." before any supplementation duty arises under NEPA).

### 3. *Reopening Administrative Decision*

■ I also find for defendants on a ground separate from any consideration of the merits of plaintiffs' claims. In *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), the Court articulated the following rule:

> Administrative consideration of evidence ... always creates a gap between the time the record is closed and the time the administrative decision is promulgated.... If upon the [order issuing] litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact is discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening.

*Id.* at 554–55, 98 S.Ct. at 1217. This prohibition against reopening administrative decisions has been applied to prevent the courts from reopening such decisions in a variety of contexts where new information has been proffered by litigants. *See Provisioners Frozen Express v. I.C.C.*, 536 F.2d 1303, 1305–06 (9th Cir.1976) (agency not required to reopen its proceedings five years after the administrative record had been completed and the agency official had made his findings). Here, plaintiffs seek to reopen a Forest Plan intended to have a ten-to-fifteen year duration when the decision is only two and one-half years old.

■ Plaintiffs' reasons in support of reopening are (1) completion of the new inventory of old growth ponderosa pine; and (2) allegations of "recent scientific research and the opinions of the Oregon Department of Fish and Wildlife and the Klamath Tribe...." Complaint, Count III, para. 35(c). I find that inventory of old growth ponderosa pine was contemplated by the Forest Plan and addressed in the ROD. Further, plaintiffs cannot show that the Forest Service did not consider the opinions of the agencies mentioned in (2) above, and the post-ROD letters relied on by plaintiffs fail to show circumstances warranting the reopening of the decision. The general rule is that federal courts "should be extremely reluctant to require an agency to reopen a record on the ground that the evidence has become stale." *Mississippi Industries v. Federal Energy Regulatory Commission*, 808 F.2d 1525, 1567 (D.C.Cir.1987).

This district has followed that rule on at least one occasion. In *Oregon Natural Resources Council v. U.S. Forest Service*, 21 Envt'l L.Rep. 21327, 21330–1, civ. no. 90–904–RE, 1991 WL 213418 (D.Or. April 1, 1991), Judge Redden held that a timber sale decision by the Forest Service in the Winema National Forest could not be invalidated by virtue of an event occurring after the adoption of the Forest Plan. The court held:

> The Decision Notice for Scout/Onion [timber sales] was issued on July 26, 1990. The Decision Notice took into account all relevant information pertaining to the spotted owls up to that time.... The Record of Decision adopting the Winema Forest Plan was signed September 19,

1990, nearly two months *after* the July 26, 1990 Decision Notice and after this litigation was commenced. I agree that ... the ROD cannot provide any basis for judicial review in this case.

*Id.* (emphasis in original). Judge Redden relied on both *Vermont Yankee* and *Blackfeet Tribe v. U.S. Dept. of Labor,* 808 F.2d 1355 (9th Cir.1987), in which the court reiterated, "courts have consistently ruled that administrative agencies should not be required to reopen their final orders except in the most extraordinary circumstances." *Blackfeet,* 808 F.2d at 1358 (citation omitted). I find no extraordinary circumstances here justifying the reopening of the Forest Plan ROD. Further, I find that the Forest Service has adequate mechanisms for instituting revisions of the Forest Plan, if necessary.

### CONCLUSION

Defendants' summary judgment motion is granted. Plaintiffs' summary judgment motion is denied. Defendant-intervenors' summary judgment motion is denied as moot. This case is dismissed.