**OREGON NATURAL RESOURCES COUNCIL; Forest Conservation Council; Concerned Friends of the Winema; National Wildlife Federation; Portland Audubon Society; the Wilderness Society; Natural Resources Defense Council, Plaintiffs–Appellants,**

v.

**John LOWE, Regional Forester U.S. Forest Service; Bob Casteneda; U.S. Department of Agriculture, Defendants–Appellees,**

**Thomas Lumber Co., Oregon Corporation, Defendant–Intervenor–Appellee.**

No. 93–36025.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 18, 1995.

Decided March 12, 1997.

---

David B. Edelson, Natural Resources Defense Counsel, San Francisco, California, for plaintiffs-appellants.

Robert L. Klarquist, United States Department of Justice, Environment & Natural Resources Division, Washington D.C., for defendant-appellee.

Scott W. Horngren, Haglund & Kirtley, Portland, Oregon, for defendant-intervenor-appellee.

Before: WALLACE, D.W. NELSON and BRUNETTI, Circuit Judges.

By Per Curiam Opinion; Dissent by Judge D.W. NELSON.

PER CURIAM:

### OVERVIEW

Appellants Oregon Natural Resources Council ("ONRC") and other environmental groups filed this action against the United States Forest Service, alleging that the Forest Service failed to comply with the National Forest Management Act ("NFMA") and the National Environmental Policy Act ("NEPA") in developing and amending the Winema National Forest Land and Resource Management Plan ("LRMP" or "Forest Plan"). The ONRC contends that: 1) the Forest Plan fails to insure the viability of sensitive wildlife species; 2) in developing the Forest Plan, the Forest Service relied on an outdated forest inventory and failed to respond to contrary scientific opinion; 3) the Forest Service should have prepared a supplemental Environmental Impact Statement ("EIS") to assess the environmental implications of an old growth inventory that was completed after the LRMP was adopted; and 4) the Forest Service should have prepared an EIS when the LRMP was amended. The district court granted summary judgment in favor of the defendants. We affirm the district court's decision.

### FACTUAL AND PROCEDURAL BACKGROUND

In this suit, the ONRC challenges two Forest Service planning decisions relating to the management of old growth forests on the Winema National Forest, located in south-central Oregon. It challenges the Winema LRMP and Amendment 3 to that plan. Both the LRMP and Amendment 3 were developed pursuant to section 6(a) of the NFMA, which directs the Secretary of the Forest Service to develop, maintain, and revise resource plans for units of the National Forest Service. 16 U.S.C. § 1604(a).

In addition, the NFMA directs the Secretary to issue regulations for the development and revision of forest plans. 16 U.S.C. § 1604(g). These regulations are codified at 36 C.F.R. Part 219. Among the requirements they impose is that "wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area." 36 C.F.R. § 219.19. This section further specifies that "habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area." *Id.* In order to accomplish these goals, forest plans must designate certain management indicator species ("MIS") whose "population changes are believed to indicate the effects of management activities." 36 C.F.R. § 219.19(a)(1).

In carrying out the planning process, the Forest Service is also required to abide by certain procedural requirements imposed by the NEPA. One of these is the requirement that an EIS be prepared for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Under 36 C.F.R. § 219.10(b), this includes LRMPs, for which both a draft and final EIS must be prepared. These are to be based on "the best available data," which "may require that special inventories or studies be prepared." 36 C.F.R. § 219.12(d).

The draft EIS ("DEIS") is to be issued along with a proposed forest plan and is to include "a broad range of reasonable alternatives," 36 C.F.R. § 219.12(f), along with their likely physical, biological, economic and social impacts, 36 C.F.R. § 219.12(g), and is to

designate a preferred alternative. 36 C.F.R. § 219.12(i). The DEIS and proposed forest plan must be made available for public comment for a period of at least three months. 36 C.F.R. § 219.10(b). On the basis of the public's response, a final EIS ("FEIS") is prepared. The Regional Forester then reviews the FEIS and the plan and, if he decides to adopt the plan, does so in a public Record of Decision ("ROD"). 36 C.F.R. § 219.10(c).

The Winema proposed Forest Plan and DEIS were published in December 1987 for a 100–day public review and comment period. On the basis of comments received regarding the DEIS and proposed plan, the Forest Service issued a final Forest Plan and an FEIS in 1990. The Winema Forest Plan breaks the forest into a number of Management Areas ("MAs"), which are characterized by different types of forest and objectives for use. One of these, MA7, is devoted to the provision and maintenance of old growth forest and old growth associated species. The Forest Service designated five MIS associated with old growth forest, which were to be managed so as to ensure general species viability in MA7: the pileated woodpecker, northern goshawk, three-toed woodpecker, pine marten, and northern spotted owl. With the exception of the goshawk, these MIS and the habitat protection guidelines established for them in the LRMP were drawn from the Forest Service's Regional Guide for the Pacific Northwest ("Regional Guide"), published in 1986. The Regional Guide recommended certain MIS for old growth and set minimum management requirements ("MMR") specifying the amount of habitat these MIS required to survive.

The Forest Service used a grid pattern to map the location of MA7 in the Forest, relying on information from a 1981 timber inventory. However, the Forest Service conceded that at the time the plan was drawn up it did not know where old growth stands were actually located. Environmental Assessment for Amendment 3, at 3. The Forest Service explained in the FEIS that:

> [t]he precise location of the [old growth] stands that are allocated is not determined at this time, but will be determined as part of implementation. An inventory of existing old growth will be completed by October 1, 1990. Currently the old growth stands are selected on a site specific basis in project planning to most nearly approximate the location of the grid proposed in the Forest Plan.

FEIS Appendix K, at K–292. Thus, the Forest Service did not address in the LRMP or the FEIS the "distribution of habitat across the Forest or the size of the habitat units." FEIS: 2–102. Rather, it specified the quantity of old growth to be preserved under the plan.

In September 1990, the Regional Forester issued a ROD adopting the LRMP. The ROD called for the protection of a total of 60,192 acres of old growth, which was approximately the same amount of old growth as was to be protected under the proposed plan. This area included habitat to meet the wildlife MMRs plus 24,400 additional acres allocated to old growth management. The ROD explained that once the results of the old growth inventory were available, they would be used "to locate Management Area 7 ... on the ground." At that point, it stated, issues related to the forest-wide configuration of old growth would be considered, including "distributional needs" and "minimizing fragmentation of existing habitat."

The old growth inventory was completed in 1990. It revealed that the forest contained 133,300 acres of old growth. Environmental Assessment for Amendment 3. A scientist who was involved in conducting the inventory explained that "the new inventory information [could] now be compared to the grid pattern, and final MMR sites [could] be selected to overlap with inventoried old growth stands." However, he stated that of the 178 MA7 sites originally delineated on the Forest map (on the basis of the 1981 Timber Inventory), only 34 were found to actually contain inventoried old growth. Therefore, "[i]f the purpose of the MA7 network is to protect old growth ecosystems, .... the entire distribution plan may have to be revised, since the original grid pattern proposed by the [F]orest [P]lan, for the most part, cannot be fit with nearby old growth stands." The Forest Service did not complete a supplemental EIS

addressing the fact that the majority of MA7 sites did not contain old growth while many old growth stands were located in other management areas.

In Amendment 3 to the LRMP, the Forest Service identified 24,452 acres of actual ponderosa pine and pine associated old growth stands based on the 1990 old growth inventory in order to "complete the location of Management Area 7." Decision Notice and Finding of No Significant Impact. This was the first time the Forest Service had selected specific old growth *stands* for protection (although it had selected MA7 *sites* based on the assumption that they *might* contain actual old growth stands). The Forest Service did not complete a supplemental EIS to consider the possible effects associated with its selection of the particular stands that it designated as MA7. Instead, it issued a Finding of No Significant Impact and a less rigorous Environmental Assessment (EA). The Forest Service did not discuss the implications of the inventory results for the original MA7 sites in Amendment 3 or the EA for Amendment 3.

The ONRC and other plaintiffs administratively appealed both the LRMP and Amendment 3. The Chief of the Forest Service denied both appeals. Having exhausted its administrative remedies, the ONRC and six other organizations filed this suit in the district court on September 9, 1992. They alleged that the LRMP and Amendment 3 failed to insure viable populations of old growth associated wildlife, failed to identify adequate old growth MIS, and failed to comply with NEPA. The Thomas Lumber Company and others intervened as defendants. Both the ONRC and the Forest Service moved for summary judgment. On September 28, 1993, the district court entered a final judgment granting the Forest Service's motion and denying the ONRC's motion, and dismissing the ONRC's complaint. *Oregon Natural Resources Council v. Lowe,* 836 F.Supp. 727 (D.Or.1993).

## STANDARD OF REVIEW

We review the holding of the district court denying summary judgment to the ONRC and granting the Forest Service's motion for summary judgment de novo. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995), cert. denied, — U.S. —, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996). This means that we stand in the same position as the district court. *Jesinger v. Nevada Fed. Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994).

■ In reviewing the ONRC's NFMA challenge to the Winema LRMP, we must determine whether the administrative agency's actions were "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Idaho Farm Bureau Fed'n v. Babbitt,* 58 F.3d 1392, 1401 (9th Cir.1995). Although review under the arbitrary and capricious standard is narrow, the agency must articulate a rational connection between the facts found and the conclusions made. *United States v. Louisiana–Pac. Corp.,* 967 F.2d 1372, 1376 (9th Cir.1992).

■ In the past, we have used the arbitrary and capricious standard to review an agency's NEPA compliance with respect to its factually-based decision not to prepare an EIS or to supplement an EIS. *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1330–31 (9th Cir.1992). However, in reviewing the adequacy of an EIS, "[t]his circuit employs a 'rule of reason' that asks whether an EIS contains a 'reasonably thorough discussion of the significant aspects of the probable environmental consequences.'" *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1519 (9th Cir.1992) (citations omitted). Under this standard, "[o]nce satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end." *Id.* (citations omitted).

■ In general, "judicial review of agency action is limited to review of the administrative record." *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436–38 (9th Cir.1988), amended by 867 F.2d 1244 (9th Cir.1989). However, in NEPA cases, the court may extend its review beyond the administrative record and permit the introduction of new evidence where the plaintiff alleges "that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or oth-

erwise swept 'stubborn problems or serious criticism ... under the rug.'" *Id.* at 1437 (citations omitted).

We reverse the denial of a preliminary injunction only "where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Sierra Club v. U.S. Forest Service,* 843 F.2d 1190, 1192 (9th Cir.1988).

## ANALYSIS

### I. ONRC's Claims Under the NFMA

#### A. Species Viability

The ONRC argues that the Winema LRMP violates the NFMA by failing to insure the viability of "existing native and desired non-native vertebrate species in the planning area," as is required under 36 C.F.R. § 219.19. It contends that the guidelines established in the LRMP to protect Winema's old-growth MIS (with the exception of the goshawk, which was not included as an MIS in the Regional Guide) are arbitrary and capricious because they adopt the MMRs from the Regional Guide. The ONRC argues that these MMRs were 1) outdated at the time of the ROD and 2) only intended to identify *minimum* legal requirements, rather than *desirable* management levels. It also argues that the management requirements for the goshawk established in the Winema plan are inadequate. While the ONRC has presented evidence suggesting that habitat guidelines for Winema's old-growth MIS should be revised to insure species viability, it has not met the burden of establishing that the Forest Service acted arbitrarily and capriciously in establishing these guidelines.

■ In setting the MMRs for the Winema MIS (with the exception of the goshawk), the Forest Service relied on the same research results as did the Regional Guide, dating back to the late seventies and early eighties. The DEIS for the Winema LRMP was issued in 1987. Recent studies cited by the ONRC, many of which became available after the LRMP was completed, question the validity of this earlier research. However, we do not believe that the studies cited in the Regional Guide in support of the MMRs were so outdated as to make the Forest Service's reliance upon them arbitrary and capricious.

■ It is true that the Forest Service itself recommends that forest planning alternatives should adopt management guidelines above the MMRs, which represent only the minimum level of protection required by law. In a 1986 report on the MMRs, for instance, the Forest Service stated that "[a]lthough MMR's represent acceptable levels of management, the Forest Service has directed that levels above MMR's should be developed for alternatives, in keeping with the goals and objectives of specific alternatives." Nevertheless, as the MMRs were intended to specify the minimum levels of wildlife protection required to comply with the NFMA, we cannot say that the Forest Service violated the NFMA when it incorporated these MMRs into the Winema Forest Plan.

■ We also reject the ONRC's argument that the MMRs for the goshawk in the Winema plan are arbitrary and capricious. Again, the ONRC has presented evidence which indicates that the MMRs for the goshawk should be revised. In particular, it cites to the Pacific Northwest Regional Forester's Draft Interim Goshawk Management Direction, in which the Regional Forester acknowledges that goshawk management in the region provides inadequate protection for the species. However, this document post-dates both the LRMP and Amendment 3 as well as the administrative appeals of these documents. Thus, it does not demonstrate that the Forest Service's adoption of the goshawk MMR was arbitrary and capricious.

The ONRC also cites a Forest Service study concerning goshawk management in the Southwestern United States which recommends a home range of 6,000 acres of habitat for each goshawk. However, the Forest Service argues that the 1991 study does not require that the entire 6,000 acre home range be made up of old growth, but rather, allows a variety of types of forest. We defer to the reasonable interpretation of the Forest Service.

## B. Failure to Designate the White–Headed Woodpecker as an MIS

The ONRC argues that in failing to designate the white-headed woodpecker as an MIS, the Forest Service acted arbitrarily and capriciously and left "the most critical and imperilled forest type," old growth ponderosa pine, entirely unprotected. In support of this argument, the ONRC points to an October 1989 letter to the Forest Service Supervisor from a group of Forest Service biologists, including one sent from the Winema National Forest, which concluded that the only animals closely associated with old growth ponderosa pine were the flammulated owl and the white-headed woodpecker. The ONRC also notes that both the Klamath Tribe and the Oregon Department of Fish and Wildlife ("ODFW") criticized the Forest Service's failure to designate the white-headed woodpecker as an MIS in comments on the draft EIS.

■ The Forest Service argues that the white-headed woodpecker is adequately protected by the MMRs for pileated woodpeckers and goshawks and by the forest-wide standards for cavity nesters such as snag retention requirements. Further, it asserts that although neither the pileated woodpecker nor the goshawk are closely associated with old-growth ponderosa pine, there is enough overlap between the habitats of the whiteheaded woodpecker and the goshawk and pileated woodpecker that the Winema LRMP provides adequate protection for the whiteheaded woodpecker. Because the ONRC has not shown that these justifications are arbitrary and capricious, we hold that the Forest Service did not violate the NFMA in failing to designate the whiteheaded woodpecker as an MIS in the LRMP.

## II. The ONRC's NEPA Claims

### A. The Forest Service's Failure to Consider Size, Configuration and Connectivity of Old Growth Stands to be Protected

The ONRC contends that the EIS for the Winema LRMP was not reasonable under NEPA because it was based on inadequate information about the actual location of existing old growth and because it contained no discussion of issues related to the configuration of old growth to be protected under the plan, such as fragmentation and edge effects and biological corridors. The ONRC also argues that an EIS should have been done for Amendment 3 and that a supplemental EIS for the Forest Plan should have been completed to consider the results of the 1990 old growth inventory. All of these arguments raise the same essential question, that is, whether the Forest Service was required to consider in the EIS for the LRMP the environmental significance of the size, configuration, and connectivity of old growth stands to be protected rather than simply specifying the quantity of old growth to be preserved. We decide that the Forest Service acted in accordance with environmental regulations.

■ The district court applied the "arbitrary and capricious" standard in reviewing this claim, rather than a reasonableness standard that asks whether the agency has taken a "hard look" at the environmental consequences of its decision. *Marble Mountain Audubon Soc'y v. Rice*, 914 F.2d 179, 182 (9th Cir.1990). We have long applied the "rule of reason" or reasonableness standard to review the adequacy of EISs. *See Trout Unlimited v. Morton*, 509 F.2d 1276, 1282–83 (9th Cir.1974) (review of adequacy of EIS "guided in large part by 'procedural rules' rooted in case law"). Whether we call the standard of review "arbitrary and capricious" or "reasonableness" matters little, since the Supreme Court has said that in the context of EISs, "the difference between the 'arbitrary and capricious' and 'reasonableness' standards is not of great pragmatic consequence." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 n. 23, 109 S.Ct. 1851, 1861 n. 23, 104 L.Ed.2d 377 (1989). Our circuit has defined the "rule of reason" in terms of arbitrariness and capriciousness. *See Northwest Resource Info. Ctr. v. National Marine Fisheries Serv.*, 56 F.3d 1060, 1066 (9th Cir.1995) ("An agency's EIS (or SEIS) may thus be reversed or remanded only if it is arbitrary, capricious, or an abuse of discretion. However, this court still must ensure that the agency took a 'hard look' at the environmental conse-

quences of its action.") (citations omitted). We, therefore, emphasize that the "rule of reason" standard is but a variation on the arbitrary and capricious standard used to review other aspects of EISs. *See Marsh,* 490 U.S. at 375–76, 109 S.Ct. at 1860–61 (reviewing agency's decision to supplement EIS); *California Trout v. Schaefer,* 58 F.3d 469, 473 (9th Cir.1995) (reviewing agency's decision to prepare an EIS).

While the LRMP discussed the distributional requirements (adopted from the Regional Guide) of habitat necessary for the preservation of the various MIS, the LRMP did not specify the actual on-the-ground stands that would be subject to MA7 protection. ONRC argues that this failure violates NEPA's requirements. While not entirely clear from the record, it appears that the LRMP instead considered the habitat requirements of each of the indicator species and, using the 1981 survey, identified the tentative suitability of certain acreage to meet each species' habitat requirements. *See* FEIS at B–12 to B–14. It further appears that the tentatively suitable acreage identified far exceeded the actual 35,000 acres required to satisfy the MMRs. *See id.*

Because the LRMP never made actual on-the-ground MA7 designations, analysis in the FEIS was limited to considering the environmental impact of the total acreage reserved for MA7 and the tentative suitability of certain acreage for MA7 designation. As stated in the FEIS, "[n]o evaluation is made of the distribution of habitat across the Forest or the size of habitat units." FEIS at 2–102. Instead, the ROD indicated that the 1991 old growth inventory "will be used to locate Management Area 7 (Old–Growth Ecosystems) on the ground. The inventory will also be used to verify that adequate old-growth forest exists and can be preserved in Management Area 7.... Factors to be considered in the location of Management Area 7 *will include* distributional needs [and] minimizing fragmentation of existing habitat...." (emphasis added).

After completion of the 1991 inventory, the Forest Service issued Amendment 3, which made specific on-the-ground designations for the 24,400 acres of MA7 required in the ROD over and above the approximately 35,000 acres required to satisfy the MMRs.[1] Despite the indication in the ROD that the 1991 inventory would be used to locate *all* of the MA7 acres on the ground, however, the LRMP was never amended to locate the original 35,000 MA7 acres required to satisfy the MMRs. Apparently, those 35,000 acres have not, to this day, been specifically designated.

 The ONRC argues that the failure of the EIS to consider the configuration of the approximately 35,000 MA7 acres required to meet the MMRs rendered the EIS inadequate. We disagree with this contention. NEPA requires the government to assess the environmental impact of significant government actions. "NEPA exists to ensure a *process,* not to ensure any result." *Inland Empire Pub. Lands Council v. United States Forest Serv.,* 88 F.3d 754, 758 (9th Cir.1996). The government action analyzed by the EIS in this case was the adoption of the LRMP. Because the LRMP never made an on-the-ground designation of MA7 acres, the EIS had no "size, configuration, [or] connectivity" considerations to analyze. Thus, the EIS cannot be faulted for failing to perform such an analysis.

 Criticism of the Forest Service's failure to consider "the size, configuration, and connectivity of old growth stands" is appropriately directed not at the EIS but at the LRMP itself. In essence, the ONRC would require the LRMP to make an on-the-ground designation of MA7 acres as a matter of law. However, as we have indicated, this court's review of the LRMP's substantive NFMA compliance is limited to determining whether it is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." The ONRC has not identified an LRMP on-the-ground designation requirement in the NFMA or accompanying regulations, and the failure to make such a designation until the implementation (i.e. timber sale) stage does not appear arbitrary or capricious in the practical sense. *See Inland Empire,* 88 F.3d at 757 (discussing the

---

1. In adopting Amendment 3, the Forest Service issued an EA, but not an EIS.

NFMA's two-stage approach to forest planning); *Idaho Conservation League,* 956 F.2d at 1511–12 (9th Cir.1992) (same). So long as each timber sale is evaluated to ensure that its approval would not undermine the LRMP's adopted MMR requirements, *including the habitat distribution requirements,* there is no reason why the LRMP can't fulfill its obligation to ensure the viability of existing species. So long as the plan's goals are clear and specific enough to be implemented at the site-specific, project level, it meets the requirements of the NFMA.

B. The Forest Service's Failure to Respond Adequately to Criticism of the LRMP

The ONRC also argues that the Forest Service violated NEPA by failing to respond in the EIS to reputable scientific criticisms. Again, this circuit evaluates the adequacy of an EIS under a reasonableness standard. *Id.* at 1519. As with the ONRC's previous claim, the district court applied the arbitrary and capricious standard of review rather than the reasonableness standard. *See Oregon Natural Resources Council,* 836 F.Supp. at 735. As the Supreme Court indicated in *Marsh,* there is little difference between the two standards.

The ONRC points to criticisms offered by biologists of the ODFW and the Klamath Tribe, as well as by the Winema's own biologists to which, it asserts, the Forest Service failed to respond. These biologists questioned the minimum habitat sizes established for the three-toed woodpecker, the pileated woodpecker and the pine marten. For example, in comments on the DEIS, the Winema's biologist questioned "what may be inadequate acreages established for the MMRs" and noted, "[r]ecent research on species such as pine marten and 3 toed woodpeckers needs to be reviewed to make sure our management adequately addresses the biological needs of these species." A biologist for the Klamath tribe also questioned the adequacy of MMRs for three-toed woodpeckers in its comments on the DEIS. Similarly, the ODFW recommended in its comments on the DEIS that the "habitat area for pileated woodpeckers be increased from 160 acres per site to 495 acres," citing a 1987 study.

The Forest Service's only response to some of these criticisms was that it "was constrained to operate under the Regional Guide." The ONRC complains that this response was false and that the Forest Service was required to provide instead a substantive response to these criticisms. Although we agree with the ONRC that the Regional Guide did not prevent the Forest Service from adopting larger habitat sizes for MIS in the Winema plan, we conclude that the Forest Service's responses to criticisms of the plan show that it took a hard look at the environmental consequences of planning decisions in the EIS. *See Columbia Basin Land Protection Ass'n v. Schlesinger,* 643 F.2d 585, 592–93 (9th Cir.1981) ("[T]his court's role is to ensure that the agency has taken a 'hard look' at environmental consequences."). Thus, we agree with the district court that the Forest Service did not violate NEPA by failing to respond adequately in the EIS to criticism of the Winema LRMP.

## CONCLUSION

We affirm the district court's decision that the Forest Service's actions did not violate the NFMA or NEPA. In light of our holding, we need not review the district court's denial of ONRC's prayer for injunctive relief.

AFFIRMED.

D.W. NELSON, Circuit Judge, dissenting:

I respectfully dissent from section II.A of the panel's opinion. I believe that the EIS for the Winema LRMP was inadequate under NEPA.

The Forest Service itself has emphasized that considering quantity of old growth alone is not sufficient for evaluating species viability and that it is important to consider the size, configuration, and connectivity of old growth in the forest planning process. In a memorandum to Forest Supervisors in Region 6 (the region in which the Winema National Forest is located) which was "intended to help [the Supervisors] focus the diversity discussion in [their] Final Forest Plan and Environmental Impact Statement," the Regional Forester instructed that "[f]or plant associations and seral stages that are of

concern, e.g. old growth, hardwood associations, etc., describe the following attributes: [d]istribution across the forest; [s]pacing within and across watersheds; [p]atch sizes; [p]atch shapes; [c]onnections between patches." Similarly, in the Regional Guide (from which the MMRs in the Winema Forest Plan are drawn), the Forest Service stated that:

Once the features of old growth have been examined and described, the descriptions should be used to form the basis of classification of old-growth areas. Classification is needed to give a rational basis for inventory, research, and management. The inventory will provide information on the amount, size, and distribution of remaining old growth, which is *essential data for developing research plans and management alternatives.*

Forest Service biologists explain that the configuration and connectivity of old growth have significant environmental effects on species viability:

The ecological condition of the stands contributing to total acreage must also be evaluated. Much of the [late stage/old growth] forest is extremely fragmented. Many of the Forest Plan reserves will perpetuate this fragmentation by specifying reserves in fairly small to very small blocks or in long stringers. Although these Forest Plan reserves may meet objectives relative to recreation, visual quality, and stream and soil stability, they do not necessarily provide for effective protection of old-growth dependent species and processes.... The functioning of a [late-stage/old growth] network and a successful conservation strategy for the northern spotted owl and other [late-stage/old growth] associated species are highly dependent on habitat block size, proximity of such blocks to one another, and degree of connectivity between blocks.

Alternatives for Management of Late–Successional Forests of the Pacific Northwest, A Report to the U.S. House of Representatives by The Scientific Panel on Late Successional Forest Ecosystems (including Jack Ward Thomas, Chief Research Wildlife Biologist for the USDA Forest Service, Pacific Northwest).

This court has held that a Forest Plan that included no consideration of the configuration of the old growth that was to be protected was unreasonable. *Marble Mountain Audubon Soc'y v. Rice,* 914 F.2d 179, 182 (9th Cir.1990). In *Marble Mountain,* the Forest Service completed an EIS assessing a plan to salvage and harvest timber in portions of a drainage area affected by fire. *Id.* The plaintiffs asserted that the EIS was inadequate because it did not consider the unique value of a particular biological corridor in the area. *Id.* The court agreed, stating that:

the Forest Service did not take a "hard look" at the impact of the selected salvage and harvest alternative on the Grider drainage biological corridor. Although the FEIS acknowledges that the Grider drainage is a biological corridor, it does not contain a significant discussion of the corridor issue.

*Id.* at 182.

Here, the inadequacy of the EIS is even more striking than it was in *Marble Mountain.* First, the Forest Service failed to consider the environmental significance of at least two known biological corridors. One of these is the Yoss Ridge corridor, which already has been the subject of a proposed timber sale. There, the Forest Service has approved timber harvesting which may "cause the Yoss Ridge corridor to be fragmented in several areas." It did not, however, complete an EIS to evaluate the proposed timber sale. Another corridor that is not protected by MA7 designation and is not discussed in the EIS is between Calimus Butte and Big Wocus Bay.

Moreover, the Forest Service failed to consider in the EIS *any* of the other issues related to the configuration of actual old growth stands to be protected because it did not have the information to do so. The Forest Service itself states in the FEIS that "[n]o evaluation is made of the distribution of habitat across the Forest or the size of the habitat units." FEIS at 2–102. Thus, the Forest Service did not consider the issues that were emphasized in its own directives such as "[d]istribution across the forest;

"[s]pacing within and across watersheds; [p]atch sizes; [p]atch shapes; [c]onnections between patches."

Also troubling is the fact that the inventory revealed that many areas in MA7 contained no old growth at all, while other old growth stands were located in management areas devoted to objectives such as timber harvesting. As a result, the plan may protect less old growth than is needed to meet MMRs while leaving other old growth stands available for logging. This court has held that NEPA "imposes a duty on federal agencies to gather information and do independent research when missing information is important, significant, or essential to a reasoned choice among alternatives." *Oregon Envtl. Council v. Kunzman*, 817 F.2d 484, 495 (9th Cir.1987) (citations omitted). Here, the Forest Service did not wait for the old growth inventory results that soon would be available in order to assess their implications for the Forest Plan. As a result, the Forest Service was unable to address in the FEIS issues related to the actual location of old growth stands to be protected. In this respect, the FEIS for the Winema LRMP was inadequate.

The defendants' arguments to the contrary fail. First, the defendants argue that the specific location of old growth does not need to be included in a broad, programmatic document such as a Forest Plan because no logging will be approved until site-specific assessments are performed. This argument is inconsistent with the Forest Service's own directives saying that data from old growth inventory is essential for planning. It is also inconsistent with *Idaho Conservation League v. Mumma*, in which this court held that, although the Forest Service would have to take further action under NEPA before authorizing site-specific development, "the initial plan and wilderness recommendation represent important decisions." 956 F.2d 1508, 1516 (9th Cir.1992). "Indeed," the court went on to say, "short of assuming that Congress imposed useless procedural safeguards, and that wilderness designation is a superfluous step, we must assume that the management plan plays some, if not a critical, part in subsequent decisions." *Id.*

Defendants assert that under *Douglas County v. Babbitt*, 48 F.3d 1495 (9th Cir. 1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 698, 133 L.Ed.2d 655 (1996), the administrative delineation of habitat for wildlife does not cause significant environmental effects that require an EIS. *Douglas* is distinguishable because it concerns the delineation of critical habitat under the Endangered Species Act and therefore, ESA procedural requirements rather than NEPA requirements apply. *Id.* at 1503. In contrast to NEPA, under the ESA the Secretary of Interior *must* designate any area without which the species at issue would become extinct. *Id.* Therefore, the Secretary "has no discretion to consider the environmental impact of his or her actions." *Id.* In this case, in contrast, the Forest Service is under no such obligation and has considerably more discretion with respect to the designation of habitat. As a result, the holding of *Douglas* does not apply.

Moreover, site-specific assessment is not likely to address the broad issues associated with the forest-wide configuration of old growth. Rather, it is the purpose of the Forest Plan EIS to assess the overall network to determine whether it will ensure species viability. Finally, it is unlikely that the Forest Service will complete EIS's at the site-specific level when approving timber sales. Several timber sales in areas containing inventoried old growth have already been approved and EAs rather than EIS's have been issued. *See* Finding of No Significant Impact and EA for Yoss Ridge (1991) (approving a timber sale in the Yoss Ridge area without an EIS).

The defendants also devote a great deal of discussion to the adequacy of the 1981 Timber Inventory, on which the Forest Service relied when it selected the original MA7 sites to meet the MMRs. This argument is irrelevant because the Forest Service has *conceded* that it did not know where particular old growth stands were located when it developed the Forest Plan. It was for this reason that the Forest Service conducted an old growth inventory in order to complete Amendment 3. Even assuming, however, that the 1981 Timber Inventory was ade-

quate for selecting MA7 locations, the Forest Service has not explained why it did not address issues related to old growth network configuration in the EIS. Because the Forest Service did not address these issues, it is impossible for this court to be sure that the agency took the required "hard look" at the environmental impact of the Plan. *See Steamboaters v. F.E.R.C.,* 759 F.2d 1382, 1393 (9th Cir.1985).

I conclude that the Forest Service violated NEPA by relying on the 1981 Timber Inventory and by ignoring issues such as stand size, configuration, and connectivity in the EIS for the Winema LRMP. I would reverse the district court's decision with respect to NEPA compliance and remand with instructions to issue an injunction prohibiting timber sales of the old growth that was identified in the 1990 inventory until the Forest Service addresses in an EIS the environmental impact of selecting particular stands for preservation, including edge effects, fragmentation, and the possible implications of biological corridors. Such a holding would not oblige the Forest Service to complete new inventories; it merely would require it to consider the important issues associated with the actual location of old growth reserves, taking into account inventory data that is already available.